2008 WY 2

CAMPBELL COUNTY SCHOOL DISTRICT, State of Wyoming, et al., Appellants (Plaintiffs),

Laramie County School District No. One, et al.; Wyoming Education Association; Wyoming School Board Association, Appellants (Intervening Plaintiffs)

Big Horn County School District No. One, et al., Appellants (Plaintiffs),

v.

The STATE of Wyoming, Appellee (Defendant).

The State of Wyoming, Appellant (Defendant),

v.

Campbell County School District, State of Wyoming, et al., Appellees (Plaintiffs),

Laramie County School District No. One, et al.; Wyoming Education Association; Wyoming School Board Association, Appellees (Intervening Plaintiffs),

Big Horn County School District No. One, et al., Appellees (Plaintiffs).

Nos. 06–74, 06–75.

Supreme Court of Wyoming.

Jan. 8, 2008.

Representing Big Horn County School District No. One, et al.: Timothy J. Kirven and Benjamin S. Kirven of Kirven and Kirven, P.C., Buffalo, Wyoming.

Representing the Wyoming Education Association: Patrick E. Hacker, Gregory P. Hacker and Erin M. Kendall of Patrick E. Hacker, P.C., Cheyenne, Wyoming.

Representing the Wyoming School Board Association: Tracy J. Copenhaver, Powell, Wyoming.

Representing Teton County School District No. 1: Sara E. Van Genderen of Mullikin, Larson & Swift LLC, Jackson, Wyoming.

Representing Natrona County School District Number One: Kathleen B. Dixon and Stefanie L. Boster of Murane & Bostwick, LLC, Casper, Wyoming.

Representing the State of Wyoming: Michael R. O'Donnell, State School Finance Counsel; Rhonda Sigrist Woodard, Special Assistant Attorney General, Woodard & White, P.C., Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, KITE, JJ; DONNELL and YOUNG, DJJ.

KITE, Justice.

[¶ 1] Since 1971, Wyoming courts, legislators, educators, and parents have acted to eliminate wealth-based and educational opportunity disparities in Wyoming's school finance and capital construction systems. This enormous undertaking was necessitated by the unique provisions of Wyoming's state constitution, which directs the legislature to provide a thorough and efficient education to every Wyoming student beginning at age six. The boundaries and breadth of a fundamental right to a thorough and efficient education without disparities had not previously been charted. However, by the 1990s, the severe negative impact of inadequate resources and wealth-based disparities on a school system not built upon the constitutional principles of equality, efficiency and thoroughness was apparent across the state and the cooperation and full commitment of all branches of Wyoming's government was required to rectify those disparities.

Representing Campbell County School District, State of Wyoming, et al.: Ford T. Bussart and Marvin L. Tyler of Bussart, West, Tyler, P.C., Rock Springs, Wyoming.

Representing Laramie County School District No. One, et al.: Paul J. Hickey and Richard D. Bush of Hickey & Evans, LLP, Cheyenne, Wyoming.

[¶ 2] The Wyoming constitution entrusts the Wyoming legislature with defining, developing, and implementing a thorough and efficient education system. The legislature, in reliance upon research and information from its agencies, consultants, local school districts, educators and parents, enacted statutes to correct the deficiencies in the state school system. Some of those statutes produced legitimate legal challenges. We issued significant decisions in 1995 and 2001 clarifying the constitutional mandate to be met by legislation. Since then, and continuing today, the legislature has generously responded to our decisions and its constituency by developing and refining a comprehensive, sophisticated system that meets the complex demands of delivering a thorough and efficient education to the individualized needs of Wyoming students in the 21st century.

[¶ 3] Having fulfilled its constitutional duty to define what constitutes a "thorough and efficient education," the legislature entrusted local school districts with the task of delivering it by developing appropriate educational programs, hiring quality teachers, reducing class size, and designing appropriate facilities. The legislature passed laws to fund education from state wealth and then delivered that funding to local school districts in a block grant. The level of trust the legislature has placed in the people of Wyoming is admirable and certainly one important reason that it has achieved so much since 2001.

[¶ 4] This case presents the issue of whether the legislature's efforts meet the constitutional mandate. We hold that the system is constitutional. Some deficiencies exist, some changes are required and new issues will arise; however, this Court is satisfied that the legislature has in place a thorough and efficient educational structure funded from state wealth as required by our state constitution. This Court's jurisdiction, retained since 2001, is ended.

## PROCEDURAL HISTORY

[¶ 5] In *State v. Campbell County School District*, 2001 WY 19, 19 P.3d 518 (Wyo.2001) (*Campbell II* ), we ordered the district court to retain jurisdiction of the issues until the state could demonstrate compliance with the decision's mandate on or before July 1, 2002. In *State v. Campbell County School District*, 2001 WY 90, 32 P.3d 325 (Wyo.2001) (*Campbell III* ), at the request of all parties we agreed to retain jurisdiction. On March 10, 2004, the state filed a Petition for Resolution of Constitutional Interpretation Questions with this Court. We were unable to resolve the issues presented without factual development and denied the state's petition. Thirty school districts, the Wyoming Education Association and the Wyoming School Board Association (challengers) filed a Petition for Resolution of Constitutional Questions in the district court. The challengers claimed that the state had failed to comply with the mandate of *Campbell II* for both operations and capital construction funding.

[¶ 6] Specifically, the challengers claimed that the operations funding formula was not yet cost-based for utilities, vocational education, small schools and small districts, and at-risk students; failed to properly account for inflation and the regional cost adjustment; and contained computational errors that had harmed school districts and resulted in money damages. The challengers also claimed that the latest capital construction funding formula produced inadequate facilities incapable of delivering all educational programs and improperly shifted costs to school districts under the guise of local enhancements to be funded by local bonding. The challengers claimed, and the state conceded, that it had failed to either repair or replace immediate need facilities by the deadline imposed in *Campbell II*.

[¶ 7] Following a trial on the merits in 2005, the district court issued a lengthy decision holding that the state met the *Campbell II* mandate for: at-risk students, with some adjustments required; cost of living differences, with some adjustments; administrative and classified salaries, small schools and small districts; teacher beginning and average salaries; and funding of health insurance costs. The district court also found that the recalibration of the MAP model in 2001 was cost-based and reasonably and accurately captured the cost of education.

[¶ 8]   The district court rejected the challengers' claim for money damages for computational errors and found that the state violated the *Campbell II* mandate by imposing a 20 year experience cap on teacher salaries, capping funding for routine and major maintenance when space exceeds state standards, failing to provide for funding in cases of extreme hardship during great price volatility for utilities, failing to properly fund vocational education and failing to use a specific index for the inflation cost adjustment.

[¶ 9]   On capital construction, the district court found that in 2002 the legislature had created a comprehensive system to provide safe, efficient, adequate and equitable school facilities in Wyoming by enacting statutes and creating the School Facilities Commission (SFC) which promulgated rules and regulations.   Nevertheless, the district court found that the state had failed to meet the *Campbell II* and *III* deadlines for immediate need facilities and technology readiness. The district court held that the SFC rules and regulations were constitutional except those related to adequate space for cocurricular activities, dedicated long distance learning rooms, adequate computer rooms and utility installation and road costs.   The district court also ruled that the state was not constitutionally required to build facilities for athletic activities.   All parties appealed the ruling and the cases were consolidated.

## STANDARD OF REVIEW

[¶ 10]   We review findings of fact made by the district court after a bench trial using a clearly erroneous standard.   A finding is clearly erroneous when, even though substantial evidence supports it, the reviewing court is left with the definite and firm conviction that a mistake was made.   We review legal conclusions *de novo*.   *Mullinnix LLC v. HKB Royalty Trust*, 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006).   This standard is central to our jurisprudence generally and to every case we have decided involving the Wyoming public school financing statutes.   Some of those cases did not involve review of a district court decision after a trial.   Although we did not specifically address the standard of review in the

cases involving purely legal issues, our review was clearly *de novo*.   *Washakie County School District No. One v. Herschler*, 606 P.2d 310 (Wyo.1980); *Campbell County School Dist. v. State*, 907 P.2d 1238 (Wyo. 1995) (*Campbell I*); *Campbell II*, 2001 WY 19, 19 P.3d 518; *Campbell III*, 2001 WY 90, 32 P.3d 325.

[¶ 11]   The parties' briefs in this case indicate some confusion about the difference between the standard of review guiding this Court's consideration of the decision being appealed and the constitutional test applicable to matters related to public education. It is important to differentiate between the two.   Our school finance cases have unequivocally held that the Wyoming constitution establishes education as a fundamental right. Accordingly, Art. 1, § 34, which guarantees equal protection under the law, prohibits wealth-based disparities in education funding.   *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle*, 491 P.2d 1234, 1236–37 (Wyo.1971); *Washakie*, 606 P.2d at 332; *Campbell I*, 907 P.2d at 1245; and *Campbell II*, ¶ 5, 19 P.3d at 528.   However, we have consistently recognized that "exact or absolute equality is not required."   Therefore, differences may exist in funding between school districts if those differences result from differences in the cost of providing education.   *Washakie*, 606 P.2d at 336.   Any state action resulting in a wealth-based disparity in public education funding will be subject to "strict scrutiny to determine if it is necessary to achieve a compelling state interest."   *Id.* at 333.   In addition, this test requires "the state [to] establish that there is no less onerous alternative by which its objective may be achieved."   *Id.* (citing *Horton v. Meskill*, 172 Conn. 615, 376 A.2d 359 (1977)).

[¶ 12]   In *Campbell II*, this Court held that the cost of education model the legislature adopted to allocate funds for public school operations was constitutional.   Properly implemented, the model would assure that differences in per student funding between school districts would be based not upon local wealth but upon differences in the cost of providing education in the various school districts.   In addition, we held that so

long as the specified modifications were made by the state, the funding was adequate to provide the education that the state deemed appropriate. Because the model is so critical, this Court examined each component and found that some had to be revised to more accurately reflect true costs. In addition, so long as the state chose to rely upon a cost of education model to distribute state funds for school operation, the model needed to be recalibrated beginning in 2001, and every five years thereafter, to assure that it continued to reflect the true cost of education over time as accurately as possible. If the state complied with that mandate by revising those components to better reflect true costs and conducting the recalibration appropriately, the system of funding school operations would be considered devoid of wealth-based disparities, to adequately provide the education the state required, and thus, be constitutional.

[¶ 13] In this most recent round of litigation, the issues before the district court regarding compliance with the *Campbell II* mandates for operation funding were factual and the state had the burden of proving those facts by a preponderance of the evidence. *Montoy v. State*, 279 Kan. 817, 112 P.3d 923, 929 (2005); *DeRolph v. State*, 83 Ohio St.3d 1212, 699 N.E.2d 518, 519 (1998). The issue presented to the district court was whether or not the state's revisions and the recalibration reflected costs as closely as could reasonably be expected. If they did, then any differences in funding between school districts were not wealth-based and, therefore, did not invoke the equal protection provisions of our constitution. In this context, the strict scrutiny test, discussed above, is not in play. We simply review the district court's factual findings using the clearly erroneous standard. Some of the challengers seem to contend that strict scrutiny (used to determine if a classification denies equal protection of the law) should be applied to determine whether the modifications adopted by the state resulted in what the challengers deem to be inadequate funding for public education. This argument is not supported by any authority and misconstrues the strict scrutiny test.

[¶ 14] Further, the challengers contend the education provisions of the constitution, as interpreted by this Court, require the state to provide funding for more than what the state has determined education should cost. Art. 7, § 1 provides:

The legislature shall provide for the establishment and maintenance of a *complete and uniform* system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other institutions as may be necessary. (emphasis added.)

Art. 7, § 9 provides:

The legislature shall make such further provision by taxation or otherwise, as with the income arising from the general school fund will create and maintain a *thorough and efficient* system of public schools, *adequate to the proper instruction* of all youth of the state, between the ages of six and twenty-one years, free of charge; and in view of such provision so made, the legislature shall require that every child of sufficient physical and mental ability shall attend public school during the period between six and eighteen years for a time equivalent to three years, unless educated by other means. (emphasis added).

This Court has interpreted those provisions to require the legislature to:

"provide an education system of a character which provides Wyoming students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually[.]"

. . . .

"define and specify what a 'proper education' is for a Wyoming child."

*Campbell I*, 907 P.2d at 1259.

"do the best that we can do."

*Id.* at 1279.

"provide a thorough and uniform education of a quality that is both visionary and unsurpassed."

*Campbell II*, ¶ 51, 19 P.3d at 538.

[¶ 15] The challengers rely upon these statements to argue that our constitu-

tion requires the state to provide funding and facilities for whatever programs each district chooses to offer. They argue that if the state sets the funding based upon what it contends a proper education for Wyoming's children should cost then the state somehow fails to fulfill its obligation under the education provisions of the constitution. While we are certain the school districts are motivated by a true desire to serve our state's children as well as they possibly can, we disagree with this constitutional theory for two important reasons. First, we have consistently held that the constitution imposes on the *legislature* the obligation to determine the kind of education Wyoming's children will be afforded. Second, the challengers seem to be saying the courts should determine the proper level of educational funding and in doing so the will of the school districts must prevail. Courts can, and should, protect against a failure of the state to fund a system capable of meeting state standards. However, the determination of whether to require funding in excess of the level deemed adequate to meet state standards must be left to the legislature. For the most part, the district court found that the adjustments provided adequate funding to achieve the state's educational requirements and those factual findings are subject to review under the "clearly erroneous" standard.

[¶ 16] With regard to *Campbell II's* mandate on capital construction, this Court required the state to use state funds to remodel or replace those school facilities identified by the state as inadequate, under its process in place at the time, within a prescribed time frame. In response, the state adopted a process that used state funds, but identified the capital construction needs in a completely different manner. Whether that system is constitutional involves factual findings concerning whether the funding is adequate to allow school districts to provide the education deemed appropriate by the legislature, and whether the system as designed provides capital facilities without reliance on local wealth. Those factual findings are also reviewed under the clearly erroneous standard.

## DISCUSSION

### I. OPERATIONS

#### 1. *Recalibration*

[¶ 17] The state performed its first recalibration as directed by this Court in 2001, and the legislature adopted the employee compensation and benefits recommended by that effort in the 2002 legislative session. The district court held that the recalibration "provided public school funding which reasonably and accurately captures the cost of education in Wyoming." In addition, the district court concluded the legislature had acted "responsibly and diligently in making these adjustments." After a careful review of the trial record, we hold the district court's findings were not clearly erroneous and, in fact, were supported by substantial evidence. In addition, the legislature adopted Wyo. Stat. Ann. § 21–13–309(t) (LexisNexis 2007) requiring the recalibration to occur every five years, and we take judicial notice of the fact that the legislature performed another such recalibration in 2006.[1] Although the substance of that recalibration is not before us, the fact that it was performed is evidence of the legislature's continuing commitment to follow the Court's direction and assure the model is up to date and as accurate as possible.

[¶ 18] To comply with the recalibration requirement of *Campbell II*, the legislature contracted with Management Analysis & Planning Assoc., Inc. (MAP) to conduct the 2001 recalibration. We noted in *Campbell II* that MAP was "a well recognized and credentialed consulting firm with expertise in public school finance...." *Campbell II*, ¶ 11, 19 P.3d at 529. In the course of conducting its review of the model, MAP visited over 100 schools and 41 districts, met with advisory committees of teachers and administrators, evaluated data submitted by the school districts and available in the public domain, and relied upon its professional judgment. Because 80% of the cost of operating the public

---

1. "It is within this Court's prerogative to take judicial notice of the official reports of state agencies." *Campbell II*, ¶ 67, 19 P.3d 518, 563 fn. 56; *Dellapenta*, 838 P.2d at 1159 (citing *Washakie*, 606 P.2d at 322, n. 16; *Hinkle*, 491 P.2d at 1237).

schools is personnel, the primary issue regarding the adequacy of the recalibration efforts was the number of employees and their compensation. Obviously, the key category of employees is teachers. The challengers criticize the recalibration because it did not follow the same process utilized when the model was first created, i.e. obtaining input from panels of Wyoming educators and developing the parameters from the ground up, such as the number of teachers required, class size, etc. We agree with the district court that *Campbell II* did not dictate any particular recalibration process, but only that the individual components should be reviewed so that the model remained current. To start from scratch every five years would seem impracticable and unnecessarily costly. We think it fair to assume that if major changes occur in the field of public education that would affect the assumptions in the model, and the state and the school districts believe such changes should be implemented in Wyoming, the model will be adjusted accordingly in the recalibration process.

[¶ 19] MAP concluded the class size originally adopted in the 1997 model, 16 students for K–5 and 21 students for 6–12, remained appropriate and the personnel in the model was sufficient to achieve these class sizes. Based upon MAP's research, Wyoming's teacher/pupil ratio is lower than most other states and available research does not justify smaller class sizes than are in the model. The challengers did not seem to contend a specific smaller class size, with an accompanying increase in the number of teachers, should have been included in the model. Instead, they contended that many school districts hired more teachers than provided for in the model. With regard to other personnel issues, MAP reported that it received mixed signals from its investigation and some schools thought more substitute teacher time should have been considered as well as security personnel and other administrative support. It noted that there are always some who believe more teachers are necessary; however, most principals said they had adequate staff to deliver the educational services required. While the challengers criticized the thoroughness of MAP's efforts, they did not offer any specific change in the class size numbers.

[¶ 20] The challengers' primary focus, instead, was on teacher salaries, claiming the salaries provided for in the recalibration and the adjustments to those salaries in the period between recalibrations were inadequate. The district court found the average salary, considering education and experience, had increased from $32,014 in the 1997 model to $36,871 in 2001, representing a 15% increase during a time when the Wyoming Cost of Living Index (WCLI) had increased 13.2875%. In addition, the actual salaries being paid for 2001–02 were used in the recalibrated model. However, at trial, all of the experts agreed that the salaries actually being paid by Wyoming schools exceeded the salaries provided for in the model, thus requiring schools to move funds from other needs to pay salaries. This problem is somewhat unavoidable and results from salary increases that occur between recalibrations. The challengers claim that because salaries in the model are not escalated annually, they must "rob Peter to pay Paul" when competitive pressures and inflation force them to increase salaries to remain competitive in the interim. The state contends that local control over how funds are allocated is contemplated by the block grant/model approach, many schools do not spend the full allotment for every line item in the model and, consequently, sufficient funds are available to accommodate those increases. In addition, *Campbell II* also required an external cost adjustment to assist in addressing the problem of inflation between recalibrations. In fact, as the state points out, the model is not intended to be a "real time" picture of the various cost categories and there will always be some differences between the costs included in the model and the school districts' real expenditures. In addition to showing that actual salaries exceeded those in the model, the challengers presented evidence that some school districts continue to have difficulty filling positions, an indication that salaries are too low.

[¶ 21] Having heard the competing opinions, the district court concluded, on balance, the state's experts' opinion that the salaries

and benefits were adequate to attract and retain teachers was sound and credible. As support for its conclusions, the district court noted Wyoming's average teacher salary upheld in *Campbell II* caused it to rank 42nd nationally and, in 2002–03, that rank had improved to 36th; Wyoming's beginning and average salaries exceeded other states in the region except Colorado; salaries had increased 24.6% from 2001–02 to 2004–05; and beginning teacher salaries ranked 29th in the nation, higher than Arizona and Nevada, states often cited by the challengers as offering more competitive salaries.

[¶ 22] As additional proof that salaries were inadequate, the challengers contended Wyoming had too many uncertified teachers. The evidence demonstrated that 95% of Wyoming teachers were fully certified although some rural districts had a higher percentage. This rate compared favorably to other states and had improved since the time the model was instituted. MAP concluded that provisional certification of teachers was not a pervasive problem and was limited to certain districts and specific specialties. Having weighed all of the evidence, the district court found, "Notwithstanding those deficiencies noted above, the weight of the evidence indicates that Wyoming's teacher salaries are not lagging behind other states in the region; Wyoming has improved its average salaries and beginning salaries and Wyoming teacher salaries are adequate to maintain a qualified work force." [2]

[¶ 23] Upon review of all of the testimony, we cannot conclude the district court's findings were clearly erroneous. We discern from the district court's order that the findings were influenced by both the district court's conclusion that the state's experts had done a thorough and adequate job analyzing the issue as well as the state's actions to increase salaries after the 2001 recalibration. Those actions resulted in the average salary increasing to $40,618 in 2004, and a special appropriation in 2005 of $22,736,000 for employee bonuses. We take judicial notice that the legislature adopted additional increases

after the trial pursuant to the 2006 recalibration, resulting in a salary of $45,126 with a corresponding increase in benefits to 19.66% and a health insurance benefit of $8,169. 2006 Sess. Laws, Ch. 37.

[¶ 24] The cost of health insurance is an obvious concern to all. MAP used the average of the actual district expenditures for 2001 in the recalibration. We take judicial notice that an additional $33,321,418 was appropriated in 2005 to assist districts with increasing health insurance costs in the interim between recalibrations. 2005 Sess. Laws, Ch. 21, § 2. It appears clear to us that the current legislature is committed to assuring teacher salaries and benefits in Wyoming remain adequate to deliver a constitutionally sound public education system. We trust it will continue to do so in the future.

[¶ 25] With regard to administrative and classified salaries, MAP evaluated the salaries and, pursuant to *Campbell II*, adjusted them for responsibility, measured by number of students, education, including advanced degrees, and experience. The district court was satisfied that these adjustments demonstrated compliance with this Court's mandate and we agree.

[¶ 26] The challengers raise a global issue regarding the models and their recalibration. Suffice it to say, the model used by the state to allocate funding to the state's schools has evolved over time in response to newly available data, mandates from this Court, and legislative changes. Integration of the law into a computer model presents an obvious challenge and understanding how the various modifications apply and interact is difficult for all concerned. The districts report new information each year regarding their expenditures and the demographics of their students and school personnel, and the legislature makes various adjustments to address inflation and other issues. Each year, after the legislative session, adjustments are made and the revised model, in Microsoft Excel format, is filed in the Secretary of State's

---

2. The recalibrated model did not provide for additional funding for teachers with more than 20 years of seniority and the district court found that 20–year "cap" to be unconstitutional. How-

ever, in 2006 that cap was removed and, consequently, this issue is moot. 2006 Sess. Laws, Ch. 37.

office. The state has chosen to provide only the most general information in the statutes concerning the model and to refer to the version filed with that office as reflecting the most current funding allocation. http://legis web.state.wy.us/2007/interim/schoolfinance/ modelversions.htm.

[¶ 27] The original MAP model was delineated as Model 3.2. Following *Campbell II*, changes were made in the model and errors were corrected. From 2001 through 2004, versions 3.2b, 4.1a, 4.2, and 4.2a were adopted by the state pursuant to its consultants' recommendations. At various points in time, there were differences between what the models indicated should be paid to the school districts and what the legislature actually paid. The district court attributed those differences to the legislature's attempt to comply with the time deadlines of *Campbell II* and the availability of the data necessary to do so. In addition, the district court found that these differences did "not violate the cost-based principle" and could be explained by changes made to reflect revised data submitted by the Wyoming Department of Education (WDE).

[¶ 28] To complicate things further, these models, adopted by the legislature by reference, are not the models used by the state to allocate appropriated funds. Instead the WDE developed a funding model which changes from year to year based again upon information provided to the districts such as teacher seniority data, transportation and special education's actual costs, and data related to at-risk students. The challengers provided evidence that the results of the funding model differed from the results achieved by the model on file with the Secretary of State that had been adopted by the legislature. In response, the state's expert, Richard Seder, undertook a study during the trial to determine for the district court whether the funding model captured the substance of Model 4.2a, the then-current version filed in the Secretary of State's office. He concluded that the funding model delivered the same level of funding as model 4.2a and, in fact, found an overpayment of $2.4 million had occurred over a three-year period, reflecting about 1% of the funds distributed in that time. The district court clearly found Mr. Seder credible, stating, "No other witnesses who presented testimony in the trial ha[ve] displayed Seder's over-arching ability in this field." [3]

[¶ 29] In support of their claim that the models are flawed, the challengers point to the fact that they do not use the per student allotment set out in the statutes. Section 21-13-309. The state explained, and the district court concurred, that this fact resulted from the change in approach required to reflect the line-item adjustments made to comply with *Campbell II*. Originally, the MAP model developed prototype schools, calculated what the costs were in those prototypes and then multiplied those costs by each district's student population, i.e. the average daily membership (ADM). That cost per ADM was then incorporated into the statutes. The modified model disaggregated the prototypical costs into the various components in order to more precisely capture the cost of education, an approach the state believed was required by *Campbell II*. Although the revised model did not contain the statutory ADM figures, a re-aggregation of the modeled numbers resulted in a very close comparison to the statutory figures. In addition, the district court found, as a factual matter, that the state and its consultants acted in good faith in their efforts to ensure that the model on file with the Secretary of State reflected legislative intent, even though minor errors were later discovered, and the end result was that the amount actually received

3. The challengers' evidence showed $5,060,103 less was distributed by the state funding model than would have been under Model 4.2a. While they admit that amount might be considered *de minimus* in light of the total education funding, they point out two school districts where the impacts were significant. Park County School Dist. 16 (Meeteetse) received 20% less and Sweetwater County School Dist. No. 1 (Rock Springs) received $1,279,699 less pursuant to the challengers' calculations. The state did not provide any explanation for those particular results and this Court is not in a position to determine whether they were caused by appropriate adjustments or whether they represent mistakes causing funding differences not based upon cost. However, as we note below, individual districts have the opportunity to appeal their funding allocation if they believe errors were made and their block grant does not comply with the law.

by the districts was substantially consistent with legislative intent. The district court was satisfied that these deviations did not result in a failure to provide cost-based education funding.

[¶ 30] We hold the district court's findings regarding the efficacy and accuracy of the models were not clearly erroneous. Further, we conclude the state's effort to respond to the requirement that the models be updated and recalibrated met the requirements of this Court's mandate. We also note that individual districts are given the opportunity to certify to the WDE that the amount of funding they receive is improperly calculated and, if a district believes the actual block grant it receives is not consistent with requirements of the law, it has the opportunity to appeal that action in accordance with the Wyoming Administrative Procedure Act. Wyo. Stat. Ann. §§ 21–2–201 and 202(d) (LexisNexis 2007).

[¶ 31] At this point, we make the observation that *Campbell II* required the state to revise certain specified inputs in the model so that actual costs would be reflected, as accurately as possible, in the method of funding chosen by the state, a cost of education model. Further, because the model approach was a proxy for actual costs and was largely based on historic costs, we required that the state take appropriate steps to assure the inputs to the model were updated to reflect reality as much as possible. Not an unreasonable requirement, from our point of view. This Court did not and should not dictate the method the state must use to determine the cost of education. We caution all of the stakeholders in this process to avoid reading into our legal rulings a desire or intent to direct and control the inner workings of the computer models selected by the state. It seems that in the debate at trial over intricacies of the various models, the parties somewhat lost perspective on the primary constitutional issue—does the state's chosen method of funding represent, as close as reasonably possible, the cost of education. Surely, one must question whether errors of the magnitude of those demonstrated at trial have any measurable impact on the state-wide quality of education.

## 2. *Maintenance and Operations*

[¶ 32] Prior to *Campbell II*, the districts received funding for the cost of maintenance of school buildings based upon 1996–97 state-wide averages on a per pupil basis. We held that approach was not based upon actual costs and the state must develop a formula which considered ADM, building square footage and the number of buildings to more closely approximate actual costs, or reimburse actual costs subject to state oversight. *Campbell II* ¶ 31, 19 P.3d at 544. In response to this Court's mandate, the state and its consultants undertook a study of operation and maintenance costs and concluded full reimbursement would fail to provide incentives for districts to manage buildings cost-effectively. They recommended 5% of operations and maintenance funding should be classified as major maintenance and funded as capital construction, 70% of the remaining adjustment should be based on square footage, and 30% on ADM. The resulting adjustment was inflated using the WCLI. The number of buildings was not included in the formula.

[¶ 33] After the creation of the SFC, and its adoption of allowable square footage for new school buildings, a new formula was developed that limited the square footage for which districts could receive funding for operations and maintenance to encourage districts to eliminate excess building space. That formula provided funding for 135% of the allowable square footage for 2004–06, 125% for 2006–08, and 115% for 2009 and thereafter. Utilities were funded on the average of actual costs and escalated in the recalibration process.

[¶ 34] The district court found the method of funding operation and maintenance did not comply with the mandate of *Campbell II* because it did not reflect the actual costs and, although the state had a compelling interest in minimizing excess square footage, it did not provide the districts with the necessary support to reduce any excessive square footage they may have because of buildings constructed before the SFC guidelines were adopted. Thus it did not meet the constitutional test of using the least restric-

tive means of achieving the state's interests. In addition, the district court held the method of adjusting for utilities did not provide for the extreme price volatility that the districts had experienced.

[¶ 35] The state contends the district court erred in concluding it had not used the least restrictive alternative to accomplish its legitimate state interest. It argues that the formula is aimed at ultimately funding operation and maintenance on a cost basis by reducing allowable square footage over time, and this Court approved of such transitional approaches in *Lincoln County School District No. One v. State*, 985 P.2d 964, 967 (Wyo.1999). In addition, the state points out that the challengers provided no testimony that major maintenance payments were insufficient or that routine maintenance amounts had not been so inadequate as to prevent districts from delivering the required educational programs. The only other alternative, the state contends, is for it to require closure or consolidation of schools—a route the districts obviously would not want to take. With regard to utilities, the state reports that the 2006 legislature adjusted funding for utilities by using actual, rather than average, 2004–05 costs for each district and provided for escalation of those numbers by "appropriate inflation factors in subsequent years." Enrolled Act 23, 2006 Sess. Orig. H.B. 0139, 58. The state noted the district court's finding that a less onerous method existed to address excess space, i.e. to first determine if removing excess square footage was feasible and then funding districts' efforts to do so, was never discussed at trial and was first mentioned in the district court's order.

[¶ 36] As we approach this issue, we note first that the state did respond to the mandate of *Campbell II* and adopted an operation and maintenance formula that more closely reflected actual costs because it was more heavily weighted to actual square foot-

age and was escalated for inflation.[4] We also conclude that the 2006 legislature appears to have properly addressed the issue of utilities by using each district's actual 2004–05 costs and escalating them. Whether the State's new approach of limiting the square footage for which it will provide operation and maintenance funding is constitutional is the question we must resolve.

[¶ 37] The district court found that excess square footage existed because buildings were built before the SFC standards were adopted or because of declines in enrollment, both causes beyond the districts' control. Those findings are supported by the evidence and are not clearly erroneous. The district court then applied the strict scrutiny test and concluded that reducing excess square footage did represent a compelling state interest, but could have been accomplished in a less onerous manner. Those conclusions involve a question of law which we review *de novo*.

[¶ 38] It should be remembered that the strict scrutiny test applies when differences in funding are wealth-based. If the difference in funding between districts is based upon what the state has determined a particular component should cost, and not on wealth, then an equal protection issue is not raised. We observe that no one has suggested the differences in operation and maintenance funding between districts are not based upon the state's determination of what that component should cost. Consequently, applying the proper constitutional measure, one must conclude the differences in funding do not result in a denial of equal protection. Even if the equal protection standard is applied to the differences in operation and maintenance funding between districts, we agree with the district court's conclusion of law that the state has a compelling interest in regulating the size of public school buildings, not only to assure public funds are

---

4. The challengers note that the formula does not consider the number of buildings as mentioned in *Campbell II*. The record reflects that while MAP recommended including that factor, the school districts urged the legislature not to do so and the legislature followed that recommendation. While we recognize that the number of buildings could affect the cost of operation and maintenance, the challengers provided no evidence to that effect and we are not convinced it is a significant factor in the equation. It was mentioned in *Campbell II*, however, in the context of requiring a formula that more accurately reflected actual costs than that used in the 1997 model, not as a mandatory inclusion in such a formula.

wisely spent, but also to assure each student ultimately has the benefit of approximately similar facilities.[5]

[¶ 39] The district court's conclusion that the operation and maintenance formula was not constitutional rested upon its belief that less restrictive means of accomplishing the state's interests existed. It suggested the state must provide "technical and financial assistance" to reduce the excess square footage and that failure to do so would require the districts "to take money from other educational needs to make up the difference, which adversely impacts the ability of districts to provide the constitutionally mandated education." Although that is, of course, theoretically possible given the state's modeled approach to determining costs, the district court's compliance order does not make any findings regarding any additional costs that would be incurred to conduct that effort. In fact, the state points out that this alternative approach was raised for the first time in the district court's order and, consequently, none of the parties presented evidence on what those possible additional costs might be. On the other hand, the state presented evidence that while numerous districts have square footage in excess of the standards, the total statewide square footage exceeds the standards by 29%. Given the fact that the formula allows funding for 135% of the standards until the school year 2005–06, 125% until 2008–09, and 115% thereafter, the impact statewide of the limitations does not appear severe and it is unlikely these limitations would prevent the districts from providing adequate educational programs.

[¶ 40] In their briefs on appeal, the challengers suggest less onerous alternatives might be for the state to: (1) provide technical assistance to help the districts come into compliance; (2) plan temporary mothballing of portions of the excess square footage; (3) develop programs to allow use of the excess space by others (i.e. rent) to reduce the costs; and/or (4) evaluate each building on an individual basis to determine whether practical alternatives exist. They also suggest the state should provide funds to support these efforts. While all of these efforts make sense and we presume the districts and the state are undertaking some combination of those efforts, no evidence was presented that these efforts would require more funding. We simply cannot conclude on the record extant that the state's approach results in differences in funding between districts not based upon the costs as deemed appropriate by the legislature. While we may agree that the state could be more generous, it is not our role to determine the ultimate square footage it must utilize for the operation and maintenance factor in the model.[6] We recognize that this approach presents administrative challenges for the districts and we urge the state to provide the assistance the district court envisioned possible to reduce the impact where excess capacity results through no fault of the districts.

[¶ 41] Utilizing the *de novo* standard of review on this question of law, we hold the state's approach to funding operation and maintenance does not violate the equal protection clause of the Wyoming constitution.

### 3. At Risk Students

[¶ 42] All parties recognize that it is more expensive to educate students considered to be "at risk," a term defined by the state regulations as school age individuals who exhibit behaviors that place the students at risk of experiencing educational failure. In *Campbell II*, we concluded the manner in which the state had calculated those additional costs in the original MAP model was

---

5. The challengers contend that the district court may have erroneously assumed that "saving money" is a "compelling" state interest. The challengers are correct to state that while reducing square footage and saving money from the reduction is a legitimate governmental interest, it is not a compelling state interest. *See e.g., Saenz v. Roe,* 526 U.S. 489, 507, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (holding that saving money, the state rationale for providing different benefits based on durational residency, is not a compel-

ling interest); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 263, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) ("a state may not protect the public fisc by drawing an invidious distinction between classes of the citizens....") The state must do more than show the challenged action "saves money."

6. See the discussion on the adequacy of the SFC guidelines for school facilities.

flawed because it was not supported by the evidence, and resulted in arbitrary allocations of funds not based upon actual costs of the necessary programs or even an estimate of what those costs should be. *Campbell II,* ¶¶ 73–84, 19 P.3d at 545–48. That approach provided additional funding for economically disadvantaged youth (EDY) and for students for whom English is a second language (ESL).[7] For EDY students, that funding was an arbitrary $500 (based on one reading intervention program) for each student enrolled in the free and reduced cost lunch program if the number of these students exceeded 150% of the statewide average. If a district had 149% or less than that number of such students or if the students were at-risk for other reasons, no additional funding was provided. With regard to ESL students, the model provided approximately $900 per student (based upon one state's experience) if such students exceeded 20% per grade level or 25% of the school-wide ADM. Again, schools with fewer such students received nothing. We recognized that reliance upon the number of students signing up for the lunch program may be a partial proxy for the number of EDY students and, clearly, ESL students could be identified. However, no evidence supported the amount of funding actually provided by those measures. Other measures were discussed such as identifying low performing students, but MAP had rejected such measures as rewarding failing schools. Recognizing the difficulty in developing a reliable formula to determine what additional funding was actually required, *Campbell II* directed the state to *either* fund the actual costs of additional services needed to educate such students *or* develop "an accurate formula with which to distribute adequate funds in lieu of direct reimbursement...." *Campbell II,* ¶ 81, 19 P.3d at 547. We specifically did "not prohibit the use of those formulas (EDY and ESL) for partial funding" of those needs. *Id.*

[¶ 43] In response to *Campbell II's* mandate, the state, through its consultants, conducted an extensive survey of the programs in Wyoming schools for at-risk students, and undertook a comprehensive review of the literature on such programs and the approaches taken for funding such programs in other states. It conducted site visits in 30 schools, large and small, and closely examined schools that had qualified for at-risk funding under the original MAP model and those that had not. The study included examining how such students were identified and what types of programs were offered to assist them, paying special attention to the Velma Linford elementary school in Albany County because 70% of its students were identified as at-risk. On the basis of this study, examination of the literature and the experience of other states, MAP recommended the at-risk funding supplement be based upon the concentration of at-risk students because research has shown the obvious—the costs associated with addressing at-risk students increase as their numbers increase in a particular school.

[¶ 44] MAP specifically recommended against reimbursing actual costs because of the difficulty of defining at-risk students, the variability in programs that could be offered and the fact that many of the programs focused on activities in the regular classroom rather than creating special classes. MAP noted that many students may be at risk for a variety of reasons and for differing lengths of time, and the preference was to defer to local control over such programs and against enhancing a state bureaucracy to oversee a program of actual cost reimbursement. Although the district court did not make any specific finding on this issue, we are convinced MAP and the state gave careful consideration to the reimbursement option as suggested by *Campbell II,* and rejected that option on the basis of sound reasoning.

[¶ 45] Relying on the literature and formulas used by schools in other states, MAP concluded additional funding in the amount of .25 times the per pupil funding should accommodate the additional costs required in the schools with the highest proportion of at-risk students. A reduced adjustment was provided for schools with a lesser proportion of such students. To identify at-risk stu-

---

**7.** The designation of students with language limitations has changed and, most likely will continue to change. We understand the current designation is English language limited or ELL.

dents, the new formula continues to use actual ESL numbers and the lunch program as a proxy for EDY. However, it considers eligibility for the lunch program, not actual enrollment. That change was intended to more accurately capture students at risk because of poverty levels, but who might not sign up for the lunch program. On an on-going basis, the state compares the number of at-risk students being served as reported by the districts with the number predicted by the model. In 2002, the state reported that the proxies were accurately reflecting the number of students receiving at-risk services in the elementary grades, but some discrepancy was noted in the middle and high school grades. In 2003, while conducting its continuing review of the at-risk funding at the direction of the legislature, MAP concluded the ESL and EDY numbers were not accurately capturing at-risk students at the middle and high school levels and that a strong correlation existed between low test scores and the mobility of students, i.e. their moving from one school to another. Upon further examination, MAP concluded that students who changed schools were often at-risk because of unstable homes or problems in other schools, and that student mobility should also be considered in determining the at-risk population. Inclusion of mobility in the identification of at-risk students increased the supplemental funds provided to the districts for at-risk programs and improved the model's accuracy.

[¶ 46] The district court expressed some concern about whether the EDY and ESL proxies were the appropriate tools to measure the number of at-risk students and suggested that test scores, or some other unidentified measure, may more appropriately identify whether students were at risk of failure. Apparently, it interpreted *Campbell II* as somehow limiting both the state's discretion and the district court's exercise of continuing jurisdiction over this litigation. We are perplexed by that interpretation since we explicitly stated, "we do not foreclose the possibility of the state in the future developing an accurate formula with which to distribute adequate funds in lieu of direct reimbursement." *Campbell II,* ¶ 81, 19 P.3d at 547. It is not for this Court to undertake

that function and we encourage the state to continue its efforts to improve the accuracy of this component, as well as the other components in the model, to assure they are as accurate as possible in estimating the actual costs.

[¶ 47] The district court's findings indicate the proxies used by the state did not capture all of the possible at-risk students or all of the possible costs necessary to address their particular problems and those findings are supported by the record. However, ultimately, the district court was "not inclined to condemn the at risk adjustment for this reason." Neither are we. There are too many variables involved in the at-risk issue to expect precision in estimating the costs of educating these students. State witnesses testified there is no one appropriate program because it varies by district, by student and by curricular area. In fact, for some students, regular classroom instruction can assist in preventing them from becoming at risk. We are persuaded that the state has continually refined its formula resulting in greater accuracy and more funds being available to the districts in this area, that it does consider student performance as one of the characteristics used in identifying at-risk students, and that no viable alternative has been suggested by the challengers other than funding any program that could be interpreted to serve at risk students. There is little question that the state exerted significant effort to develop a fair and accurate method of estimating the additional cost of addressing at-risk students and that is a much different situation than we addressed in *Campbell II.* The district court's finding that the state responded appropriately to the *Campbell II* mandate in this regard was not clearly erroneous.

### 4. *Vocational Education*

[¶ 48] Prior to *Campbell II,* no provision was made in the MAP models for vocational education even though all parties agreed that it was more costly to provide than other academic courses. Because vocational education and technical training was included by the legislature in its determination of an appropriate education, the Court required

that the state determine what those additional costs were and to include them in the funding model. *Campbell II,* ¶ 86, 19 P.3d at 548.

[¶ 49] In response, the state visited a representative variety of schools and collected data concerning their vocational education costs. The state examined the type of programs provided, the condition of the available equipment, class size, teacher salaries and necessary supplies. No differences in teacher salaries were found in the course of this study. Not surprisingly, the state discovered a wide variety in per student costs with the smaller schools spending more per student to provide vocational education. Because there were no state standards regarding this educational component and data was lacking on student participation in vocational classes, MAP recommended equipment and supply needs be met and that the legislature provide funds for equipment grants in the interim until more accurate data could be developed upon which to base a funding factor for this category of costs. In 2002–03, the legislature provided $750,000 in grant funds for equipment and tuition for students to attend vocational programs as well as an annual grant fund of $250,000. 2002 Sess. Laws, Ch. 76, §§ 5, 18. Because the average class size for vocational classes is 13 students, compared with 16.7 students for other classes, MAP recommended a funding factor of .29 per Full Time Equivalent (EQV) student attending vocational classes. The district court found, based upon the testimony of the parties' experts, that the increased operational funding, together with the grant monies, allowed the districts to provide an "abundant offering of vocational education programs." However, the challengers point out that grant applications far exceed the funds available and wide disparities exist between districts in the variety of vocational programs offered. The state does not dispute those claims, but contends that vocational education funding continues to evolve and, in 2006, the legislature enhanced funding and included vocational education as an interim study topic. Enrolled Act No. 23, 2006 Sess., Orig. H.B. 0139, 18–19, 42–43, 56. The district court found that vocational education funding was a "work in progress" and that it could not find that the

state had met its burden of proving compliance with the *Campbell II* mandate.

[¶ 50] It is important to remember that prior to *Campbell II,* no effort had been made by the state to determine the actual cost of providing vocational education in Wyoming. As a consequence, this Court required that those costs be "examined, included as a line item in the MAP model and funded accordingly." *Campbell II,* ¶ 86, 19 P.3d at 548. In response, the state undertook a serious effort to determine those costs, provided operational funding which recognized the smaller class size needed for these students, and provided funds for equipment. To that extent, the state complied. We recognize that vocational education differs somewhat from other educational funding because of the lack of specific state standards regarding what must be provided, and the expense and wide variety of equipment and facilities needed depending on local preferences. The challengers argue that because the legislature failed to provide sufficient grant money to fund all of their grant applications for equipment, it failed to develop a cost-based method of allocating funds for vocational education. However, supplies and equipment represent only 10% of the amount schools spend on vocational education. Further, no one has suggested that every school must have exactly the same vocational opportunities. If a wider discrepancy between schools in the type of vocational education offered is inherent, that discrepancy alone cannot be found to violate our constitution. We hold the state appropriately responded to our *Campbell II* mandate regarding vocational education. We encourage the legislature to continue its study of this important aspect of education funding and to exercise leadership and guidance for the districts in determining what vocational education opportunities are appropriate for Wyoming schools.

### 5. *Small School Adjustment*

[¶ 51] In the first MAP model at issue in *Campbell II,* certain adjustments were made in funding for small schools based upon the assumption that such schools experienced a diseconomy of scale because of their smaller enrollment and unavoidable fixed costs.

However, those adjustments were not based on any reliable data and were subject to arbitrary cutoffs. *Campbell II*, ¶ 99, 19 P.3d at 552. The Court mandated that these adjustments be revised to reflect actual differences in costs not experienced by larger schools.

[¶ 52] The state responded by conducting two studies of small schools, the first completed for the 2002 legislative session and the second in 2003. The studies consisted of visits to many schools throughout the state, interviews with educators and administrators, consultation with an advisory committee of the same, review of small school funding formulas that other states utilize, and a statistical analysis of Wyoming school staffing and expenditure patterns. The adjustment was revised on the basis of this data and applied in a consistent manner without arbitrary cutoffs that existed in the original model. The district court found the small school adjustment satisfied the *Campbell II* mandate and that there was no competent evidence to the contrary. We hold that finding was supported by the evidence and was not clearly erroneous.

### 6. *Small Districts*

[¶ 53] Like the small school adjustment, *Campbell II* held the original small district adjustment was unsupported by any data and thus, not cost based. *Campbell II*, ¶ 99, 19 P.3d at 552. The state was directed to assure that any small district adjustment was justified by actual data demonstrating the differences in funding based on smaller ADM and was cost based. Again, the state undertook an extensive study of district expenditures, developed prototype districts and conducted regression analyses to determine how the per student costs changed with size. The district court found the state's approach was "sophisticated and adequate" resulting in an adjustment that was cost based and complied with *Campbell II*, and that there was no competent evidence to the contrary. We hold that decision was supported by the evidence and was not clearly erroneous.

### 7. *Regional Cost of Living Adjustment*

[¶ 54] From the beginning of the use of the MAP model, the state has recognized that because the model utilizes statewide average salaries (representing 80% of the total funding), some adjustment must be made to allow for areas in the state where the cost of living is higher and those average salaries do not accurately reflect the compensation schools in those areas must pay to hire personnel. In the model at issue in *Campbell II*, MAP recommended and the legislature adopted the WCLI exclusive of the medical component and the rental of shelter subcomponent. Section 21–13–309(*o*)(ii) (LexisNexis 2005), repealed by 2006 Sess. Laws, Ch. 37, § 2. Both the district court and this Court concluded that removal of those components undermined the validity of the index. The state had argued removal of the rental of shelter component was justified because in higher cost of living areas that higher cost was the result of "amenity value" and the state should not have to fund higher salaries that resulted from the attractiveness of a particular location. Finding that argument unsupported by the record, the district court found the adjustment resulted in differences in funding not based upon costs, and thus, unconstitutional. This Court affirmed the district court and mandated that the adjustment be modified using all of the components of the WCLI "or another reasonable formula." *Campbell II*, ¶ 105, 19 P.3d at 555.

[¶ 55] In response to *Campbell II*, the legislature eliminated the exclusion of medical costs and the price of rental for shelter and amended § 21–13–309(*o*)(ii) to read:

> The amount ... shall be further adjusted for regional cost of living differences. The adjustment for regional cost of living differences shall be based upon the Wyoming cost-of-living index, as computed by the division of economic analysis, department of administration and information. The version of the index used shall be the average of the six (6) consecutive semiannual index reports completed by January 1 prior to the school year for which it is to be used.

The legislature chose not to authorize "another reasonable formula" as allowed by this Court.

[¶ 56] The problems identified by the challengers and the district court regarding the cost of living adjustment involve not the legislative action, but the state's implementation of the adjustment. The WCLI actually involves two indexes—a comparative index to measure the relative price differences between regions of Wyoming and an inflation index. The comparative index measures how much a particular area's measured cost of living (using 140 different items) differs from the state wide average. Apparently, the state used only the comparative index and simply multiplied the salaries times the percentage by which the area's cost of living differed from the state wide average. Some districts had higher than the average and some had lower—not a surprising result given that the base value was the state wide average. If a district's cost of living was 10% higher than the average, it received 10% more of an allocation than the model produced. If it was 10% lower, it received 10% less than the model produced. The result is that 37 districts received fewer funds than the model represented as the cost of providing education in this state. Even the state's expert agreed this approach did not properly account for the differences in cost of living from district to district and tended to underfund remote, rural districts.

[¶ 57] The district court agreed with both the state and the challengers and found that the methodology utilized by the state did not fairly adjust the funding allocation for cost of living differences. Districts whose salaries were adjusted downward did not pay actual salaries less than the state-wide average; in fact they often paid higher salaries. Those districts were primarily rural ones. In addition, the adjustment was applied to 85% of the allocation even though it was intended to address only salaries and salaries constituted 80%. The district court concluded the cost of living adjustment as implemented by the state under-funded many rural districts. Interestingly, even though the district court concluded the adjustment under-funded

many districts, it concluded that it did "not have the authority to overrule the Supreme Court's mandate." Apparently, the district court accepted the state's position that somehow *Campbell II* required the application of the WCLI *in the manner chosen by the state.* The plain meaning of *Campbell II* contradicts that position.

[¶ 58] In order to dispel any perception that this Court mandated that funds allocated to districts where the cost of living was less than the statewide average be reduced, we must revisit the context of the discussion in *Campbell II* and the record upon which it was based. In that case, the state, for the first time, proposed allocating funds for operations of schools on the basis of a model it claimed was cost-based. The largest component in the model was, and remains, teacher salaries. *Campbell II,* ¶ 57, 19 P.3d at 540. The state determined the teacher salary component by using the 1996–97 state-wide mean or average starting salary.[8] The effect of relying on a state-wide average was noted by this Court:

Extensive evidence in the record indicates recruiting and retaining teachers is becoming more difficult not just in Wyoming but also nationally, and certain communities in Wyoming may have more difficulty given the economic reality in their area. *The use of a statewide average salary equalizes the previous disparity by supplementing the salary component for those districts that had lower than average salaries.* The districts with higher than average salaries would presumably have paid higher salaries because of a higher cost of living, and, while the model would initially reduce their salary component to the average, it would ultimately adjust it upward based upon the regional cost-of-living adjustment.

*Id.,* ¶ 58, 19 P.3d at 541 (emphasis added).[9]

[¶ 59] As the issues were joined in *Campbell II,* no one addressed the possibility that pursuant to the state's implementation of the model and its cost of living adjustment, dis-

8. The model added to that salary figure additional compensation for advanced education and experience.

9. We note that a rehearing was granted in *Campbell II* and it was never suggested in that process that the Court's understanding of how the cost of living adjustment would operate, as reflected in this quotation, was flawed.

tricts in lower cost of living areas would be penalized and have their allocations reduced below the state wide average. In fact, the entire approach of the model assumed that figure, the state wide average salary, represented the true cost of hiring teachers. The state's consultants represented in their report to the legislature explaining the proposed model, that the use of the statewide average "encompasses both high spending and low spending school districts and 'true costs' may emerge from the mix" and that "it is possible that the model allows districts to continue to pay more than a theoretically 'true' cost for these resources, *but it is not possible that the model expects districts to provide an adequate education for less than this cost."* Cost Based Block Grant Model for Wyoming School Finance, Management by Analysis, and Planning Associates, L.L.C., submitted to Joint Appropriations Committee of the Wyoming Legislature, April, 1997, 29 (emphasis added).

[¶ 60] The only issue regarding the cost of living adjustment in *Campbell II* was whether the state's exclusions of medical costs and the rental of shelter were appropriate. The district court found those exclusions undermined the validity of the index and the state had not proved that exclusion of the housing component accurately reflected the "amenity" value of a particular location. It also "recognized that whatever method was chosen by the legislature to reflect regional differences need not be perfect, but must be a 'reasonably comprehensive measure of those differences.'" *Campbell II,* ¶ 105, 19 P.3d at 555. This Court affirmed that finding and held that the state must adjust salaries using the full cost of living differences (an obvious reference to the housing and medical costs which had been excluded) using *either* the WCLI or "another reasonable formula...." *Id.* Nowhere in our consideration of the issue, or in the issues as presented by the parties, can it be found that the state proposed to *reduce* the statewide average salary figures used to estimate the true cost of hiring teachers in those counties where the comparative cost of living was lower than the statewide average.

[¶ 61] The state did argue that the cost of living adjustment was an effort to make the model more precise and we understand that some symmetry is achieved by both increasing the funds allotted to districts with higher costs of living and decreasing those with lower costs. However, that ignores what the figure being adjusted represents, i.e. appropriate cost of providing teachers. We see no effort to compare that average figure with actual salaries being paid in those low cost districts. To do so may suggest an expenditure-based system rather than a cost-based one. We simply must assume that the salary figures in the model are the minimum. To do otherwise undermines the entire cost-based model approach to school finance funding adopted by the state.

[¶ 62] On the flip side, all parties appear to agree that in higher than average cost of living areas, the statewide average salaries will not represent true costs and those districts will need some kind of adjustment to keep pace with their markets. The question of whether that adjustment is based upon the WCLI, the only index ever proposed by the state, or, as we said, "some other reasonable formula," is a decision for the legislature.

[¶ 63] In response to *Campbell II's* mandate, the legislature acted appropriately and amended the statute to apply all components of the WCLI. The state, on the other hand, implemented that adjustment in a fashion deemed unfair by all and apparently claimed its hands were tied by this Court. To all parties concerned, we repeat, if the state chooses to use the WCLI to adjust the statewide average salaries to address situations where the cost of living exceeds the statewide average, there is not now, and never has been, a constitutional requirement that those salaries in lower than average cost areas must be reduced below what the model assumes is the actual cost. This is not a zero sum game. *Campbell I,* 907 P.2d at 1278.

[¶ 64] The state's position that its hands were tied by this Court is further belied by the action taken by the legislature in 2006 when it provided that salaries are to be adjusted by the "greater of a hedonic wage index" or the WCLI. Enrolled Act No. 23, 2006 Sess., H.B. 139, 18. A hedonic wage

index was described by the state's expert as a "sophisticated econometric approach which attempts to specifically price out those aspects of the teacher and the teacher's environment, and the work environment, and the community's environment that might lead to higher or lower payments on the part of the employer." At the time of trial, that expert testified the data was not available to develop such an index in Wyoming and MAP had been concerned that the complexity of such an approach would be difficult for the public to understand and that transparency was important. We understand that other methods of adjusting for cost of living differences, more sophisticated than the WCLI, may be available now or in the future. That is precisely why we specifically stated in *Campbell II* that the state could utilize other reasonable formulas.

[¶ 65] However, a word of caution is appropriate. It may be true that use of a cost of living index such as the WCLI will result in salary adjustments in areas of extremely high cost housing that do not represent "true cost" of hiring teachers. However, it seems to this Court that those instances are few in number. In addition, in some areas, the high housing cost may be temporary, such as when it is caused by energy booms. Consequently, it would seem possible to accommodate those anomalies with specifically tailored adjustments rather than attempting to capture all of the "hedonic" differences between all of the districts in this state econometrically. We also note that the implementation of the WCLI as described by the districts' expert, Dr. George Rhodes, appears reasonable. However, it is not the role of this Court to dictate to the state or the experts what approach must be taken in the implementation of the index. Instead, it is our role to judge whether the result achieved accurately reflects the cost of education. Apparently, all involved, the state, the districts, the district court and this Court, agree that the result obtained by the implementation of WCLI has not accomplished that result.

[¶ 66] We hold that, so long as the state relies upon a cost of education model, regional cost of living adjustments cannot reduce salaries below those which the state's model establishes as the statewide cost of hiring personnel. Any adjustment pursuant to other indexes selected by the state must result in salaries which allow districts in areas with a high cost of living to attract and retain teachers, and recognize that housing costs are a significant component of the cost of living. *Campbell II*, ¶ 105, 19 P.3d at 555.

### 8. *External Cost Adjustment*

[¶ 67] All parties recognize that because the cost-based model adopted by the state is based upon historic costs, those costs must be regularly adjusted for inflation in order to remain accurate representations of actual, current costs. To assure that adjustment occurred on a regular, timely basis, *Campbell II* mandated that the model must be re-evaluated and recalibrated every five years (as discussed above) and every two years at a minimum, beginning July 1, 2002, to account for inflation that will occur in the interim between recalibrations. *Campbell II*, ¶ 90, 19 P.3d at 549–50. Because all parties had accepted the WCLI as credible, we also noted that adjustments pursuant to that index would be found adequate and that if other methods of adjustment were adopted, they should be "structured to assure the quality of education remains adequate." *Id.*, ¶ 90, 19 P.3d at 550. The amount of the adjustments required would, obviously, depend on timing and economic conditions.

[¶ 68] In 2001, the legislature adopted a 9.44% increase for 2001–02. Thereafter, in response to *Campbell II*, the state and its consultants began the process of conducting the study necessary for the first recalibration of the model which occurred in 2002. While no specific inflation adjustment occurred in 2002, the legislature increased teacher salaries by 14.6% and overall spending by 13.2875% which exceeded the increase in the WCLI for the period 1997–01. The legislature adopted inflation adjustments thereafter in the amounts of 2% for 2003–04, 2003 Sess. Laws, Ch. 131, 2.3% for 2004–05 and 2.3% for 2005–06, 2005 Sess. Laws, Ch. 131, § 205. The total funding per ADM from 1998–99 to 2004–05 increased 90% which the expert witness for the challengers agreed caused the funding to remain relatively constant over

that period of time. That result is precisely what this Court intended by requiring the modeled funding to be adjusted at least biannually for inflation.

[¶ 69] The challengers complained because the WCLI was not applied to determine the inflation factors and the adjustments were not made based upon estimates for the upcoming year, but instead were based on data accumulated for the previous year. This Court did not mandate any particular index, but did note that if the WCLI was utilized, because all parties accepted that index, this Court would do the same. *Campbell II*, ¶ 90, 19 P.3d at 550. However, whether the WCLI was used or not is not determinative of whether the state complied with the mandate of *Campbell II*. The state's experts contended the WCLI overstated inflation and the district court seemed to agree that there were some problems using that index. It also found the adjustments were reasonable even though not based on a particular index. That finding was supported by the evidence and was not clearly erroneous. While the adoption of one index may make the adjustments easier to track, the legislature has the discretion to determine how to make the necessary adjustments. The only constitutional requirement is, so long as a model based upon historic costs is used, those costs must be escalated for inflation in order to assure education funding continues to adequately support the actual cost of education.

[¶ 70] We take judicial notice of the legislature's continued commitment to adjusting for inflation on an ongoing basis. In 2006, the legislature statutorily required that the education block grant model be recalibrated not less than once every five years to "ensure it remains cost-based in light of changing conditions and modifications to law" and that, between recalibrations, the amount computed for each district "shall be adjusted to provide for the effects of inflation." Section 21–13–309(o) and (t). That is precisely what *Campbell II* required.

[¶ 71] The challengers complain that leaving the decision regarding inflation adjustments in the hands of the legislature each year is somehow objectionable. While we understand their trepidation, the expenditure of state funds is the legislature's responsibility and whether it adopts a particular index, which it, of course, could change at any time it chose, or whether it makes a judgment biannually in the budgetary process, does not control the determination of whether school funding is constitutional. That is governed by whether the legislature does, in fact, make the adjustments necessary to assure that the historic costs continue to represent the actual cost of education. The legislature should be commended for taking appropriate action on a regular, on-going basis and for demonstrating it is committed to the long term efficacy of the funding approach it has chosen.

### 9. Challengers' Miscellaneous Objections

[¶ 72] In addition to challenging each of the district court's findings on issues addressed by *Campbell II*, the challengers present other arguments as to why the state's response is inadequate.

#### a. Cost as "Minimalist" Approach

[¶ 73] The district court described the cost-based approach required by *Campbell I* and *II* as resulting in a "minimalist concept" because the experts defined "cost" as the lowest price at which one can purchase something. In reviewing the adequacy of the funding model, the district court differentiated between what the districts were choosing to spend and what the state contended a particular element should cost. While recognizing some districts would always want more funds available, the district court concluded that funding for any component in excess of what the state had demonstrated that component should cost is the province of the legislature.

[¶ 74] The challengers contend the district court got it wrong and applied the incorrect standard to the question of whether the funding was adequate. They point to language from the constitution and the *Campbell* cases which they contend requires this state to exceed what is deemed adequate in other states and fully fund whatever programs the individual districts have adopted

to deliver education services. Noting that § 21-2-304(a)(iii) prohibits the state from establishing the curriculum for the districts to follow, they argue the state is indirectly doing just that by limiting the funds it will provide. The challengers do not criticize the proficiency standards adopted by the legislature and note they are among the highest of those states evaluated by the Northwest Evaluation Association. Instead, they contend the funds received by the state's cost-based model are inadequate for them to support the programs they have chosen to accomplish those standards. Apparently, the challengers believe the recalibration process should have involved an in-depth evaluation of the programs actually being provided by districts and the costs then determined based upon what the districts are spending to support those programs.

[¶ 75] The problem noted by the district court is that such an approach would essentially constitute an expenditure-based system in which the legislature must fund whatever the districts request. Since *Campbell I*, we have always recognized that the legislature must set the educational standards and provide an amount of funding equal to what it determines is necessary to meet those standards. Whether that funding is adequate has been measured by what other states have done in terms of salaries and other expenditures, and by other measures such as levels of teacher accreditation, class size, student test scores, and opinions of experts in the field. By those measurements, the legislature's actions have resulted in educational funding found adequate by the district court.

[¶ 76] The tension between what the districts believe is needed and what the state contends education should cost will always exist, particularly in a system such as ours that values and protects local control. The districts rightfully and jealously guard their right to determine educational programs for their communities; at the same time state control of funding is necessary to assure all communities have an equal share of the state's wealth to devote to education. It is likely these competing forces will assure some level of continuing conflict concerning the adequacy of educational funding. The language of the *Campbell* opinions characterizing our constitutional standard as requiring "visionary and unsurpassed" education, and "the best that we can do" did not invest the districts with the sole authority to determine what level of funding was required. Certainly, each of those opinions recognized it was the legislature's role to determine what a "proper" education would be for the children of Wyoming. So long as the process seeks to provide a quality education in a uniform and equal fashion, the constitutional standard has been met. In *Campbell I*, we defined a quality education as including:

1. Small schools, small class size, low student/teacher ratios, textbooks, low student/personal computer ratios.

2. Integrated, substantially uniform substantive curriculum decided by the legislature through the State Superintendent of Public Instruction and the State Board of Education with input from local school boards.

3. Ample, appropriate provision for at-risk students, special problem students, talented students.

4. Setting of meaningful standards for course content and knowledge attainment intended to achieve the legislative goal of equipping all students for entry to the University of Wyoming and Wyoming Community Colleges or which will achieve the other purposes of education.

5. Timely and meaningful assessment of all students' progress in core curriculum and core skills regardless of whether those students intend to pursue college or vocational training.

*Campbell I*, 907 P.2d at 1279.

[¶ 77] The record demonstrates the legislature has achieved each of these measures of a quality education. The funding models assumed a high school class size of 21 students and districts have actually provided non-vocational class sizes of 16.7 students and vocational classes of 13 students. These class sizes are smaller than the standard proposed in educational research. Likewise, student/teacher ratios are among the lowest in the nation and public revenue per student

is sixth in the nation.[10] The proficiency standards, adopted by the legislature and the WDE, which guide curriculum, are among the most stringent in the nation. Each school is accredited by the WDE to assure these standards are being implemented and that students are assessed on a regular basis to ascertain their proficiency. The challengers did not contend the standards were lacking or that the students were failing to achieve them. Neither was any claim made that Wyoming students were not performing adequately. In fact, the evidence at the time of trial was that Wyoming ranked as one of the highest states in the nation for schools making adequate yearly progress under the federal No Child Left Behind program. While additional funds could always be spent, appropriate adjustments were provided for at-risk students.

[¶ 78] Recognizing that good faith differences of opinions existed among experts, district personnel, and WDE officials concerning the adequacy of the state's public school funding, we agree with the district court that the state properly responded to each of the components identified as lacking in *Campbell II*. While the challengers argue passionately that the state has not done the "best we can do," it is instructive to keep in mind the various measures of adequacy utilized by this Court over the years including:

> Exact or absolute equality is not required, some variance is allowed and financial parity is the goal.

*Washakie,* 606 P.2d at 336.

> [A] "thorough and efficient education system" required by Art. 7, § 9 of the Wyoming constitution is one that is "productive without waste and reasonably sufficient for the appropriate or suitable teaching/education/learning of the state's school age children."

*Campbell I,* 907 P.2d at 1258–59.

> "[A] complete and uniform system of public instruction" and a "thorough and

efficient system of public schools, adequate to the proper instruction of all youth of the state."

*Id.* at 1263–1264.

[¶ 79] In every school finance case, this Court has consistently recognized the constitutional directive that it is the legislature's duty and prerogative to determine the appropriate standards for our public schools and to assure sufficient funding is provided to allow the districts to achieve those standards. While perfection is not required or expected, a good faith effort to preserve and protect our constitution's commitment to a sound public education system is. We are convinced, as was the district court, that the state has met that standard and will continue to do so in the future.

### b. *Timeliness of State Action*

[¶ 80] The challengers also contend the legislature ignored the deadlines imposed by *Campbell II* on a variety of issues. With regard to operations funding components found deficient, the deadline suggested by this Court was July 1, 2002, over one year after issuance of the opinion. However, we note that the opinion was issued in the middle of the 2001 legislative session leaving only one year to undertake the study necessary to determine how to accomplish the modifications and one legislative session in which to consider the necessary legislative changes. In hindsight, that deadline was too short. The record demonstrates the legislative and executive branches of government acted immediately to begin the process required, including the data gathering necessary to recalibrate the model and to refine its inputs. In recognition of the magnitude of the effort required, we recognized in *Campbell III* that extensions of time may be necessary and, had one been requested, it would have likely been granted. We do not fault the state for simply undertaking the effort as expeditiously as possible instead of spending valuable time and resources further compli-

---

10. We realize that comparing Wyoming's educational statistics with other states can be misleading because of the rural nature of our population and the need to provide small schools in remote locations to serve that population. As a consequence, we would expect to see small class-

rooms and student/teacher ratios, as well as high per student spending to support the number of small schools that do not have favorable per student cost efficiencies. However, these comparisons are some measure of the adequacy of Wyoming's public education funding.

cating this litigation by seeking such extensions. Action was taken in every year since *Campbell II* was issued, including in the years after the trial in this matter. In 2006, the legislature continued its efforts, accomplished the second recalibration of the model, increased salaries, continued to adjust for inflation and undertook additional study of many school funding issues including at-risk resources, alternative schools, summer school and extended day support, school activities and distance learning. H.B. 139, 2006 Sess. Laws, Joint Interim Education Committee Budget. We hold that the state acted in good faith on issues of operations funding and heeded the urgency expressed in our opinions.

### c. *"Cost Plus" Funding*

[¶ 81] The district court found school districts received funds that are, in essence, in addition to the cost of education as determined by the model. The primary sources of those funds are: 1) additional funding the legislature provides over and above allocations based upon the model, and 2) federal funding of specific educational functions. The latter has increased from $33 million in 2000–01 to $71 million in 2004–05 and is dedicated to low income students, teacher quality and development, special education and vocational education.

[¶ 82] Over the period since issuance of *Campbell II*, the legislature provided substantial additional funding outside of the model, characterized by the district court as a matter of "legislative grace." A review of the activities of the Joint Education Committee over those years discloses a constant effort to evaluate educational programs and needs and to seek funding beyond the model where it deemed necessary. http://legisweb.state.wy.us/2007/interim/schoolfinance/school finance.htm; See also, interim committee meeting minutes for the education committee on the legislature's website since 2003. That effort is represented by the following appropriations:

a. Reading assessment and intervention with a biennium appropriation of $7,550,640. 2004 Sess. Laws, Ch. 95, § 205; 2004 Sess. Laws, Ch. 108, § 101.

b. Full-day kindergarten with an appropriation of $6,000,000 in 2004 and $6,200,000 for SY 2005–06. 2004 Sess. Laws, Ch. 108, § 801 and § 1101(c); 2005 Sess. Laws, Ch. 121, § 3.

c. Summer school with an appropriation of $4,500,000 for 2004 and $4,500,000 for 2005–06. 2004 Sess. Laws, Ch. 108, § 1001 and § 1101(d); 2005 Sess. Laws, Ch. 121, § 1 and § 3.

d. Additional assistance with health insurance in the amount of $33,321,419 to provide. 2005 Sess. Laws, Ch. 121, §§ 2 and 3.

e. Employee bonuses in the amount of $22,736,000. 2005 Sess. Laws, Ch. 191, § 342.

f. Funds to assist school districts with recruiting teachers in special education, math, science and multiple endorsements in the amount of $400,000. 2005 Sess. Laws, Ch. 191, § 333.

[¶ 83] The challengers claim the funding is not cost-based and is simply evidence that the model under-funded the districts in those areas. The state contends funding above the model is a legislative prerogative and every district has the same opportunity to benefit from this funding. In some cases, cost studies were obtained by the legislature to guide its determination of the amount and manner of allocation of those additional funds.[11] In other cases, funds were allocated on an ADM or FTE (full time equivalent) type of formula. Further, the funding either met a temporary need or, once adequate data became available, the legislature folded these new costs into the model. Thus, the state attempted to allocate the funds outside of the model in a manner that represented actual costs as much as reasonably possible.

[¶ 84] We are puzzled by the challengers' complaints about funding outside of the mod-

---

11. Richard C. Seder and James R. Smith, MAP, *A Cost–Based Analysis of the Reading Assessment and Intervention Program,* June 3, 2003, and *A Grant Proposal to Fund Summer School Programs* *for the State of Wyoming,* Oct. 1, 2003, are examples of cost studies which accompanied the legislative action in two areas.

el. Obviously, schools are benefited by this legislative action. Recalibration of the model cannot feasibly be accomplished on an ongoing basis. During the time between recalibrations, the legislature certainly has both the prerogative and the responsibility to provide funds in areas where needs are demonstrated and the model does not provide adequate funds. To some extent, both the state and the challengers are correct. Funding outside the model is the legislature's role and also demonstrates that the model is not perfectly accurate at all times in estimating what the cost of education should be. However, we fail to see how the system could operate in any other way. So long as the legislature continues to act in a responsive and responsible manner and the model is not allowed to become out-dated, we can see no constitutional infirmity with so-called "cost plus" funding.

### d. *Pre-school Funding*

[¶ 85] Prior to trial, the state moved for partial summary judgment on the issue of whether the Wyoming constitution required the state to fund voluntary pre-schools throughout the state.[12] The district court granted that motion concluding:

My ruling is very simple on this issue. I'm going to go along with the State. I think the constitution says 6 to 21. And that precludes preschool students. It is a matter of legislative grace if they wish to fund these programs, but I don't believe the constitution compels it.

Art. 7 § 9 of the Wyoming constitution provides:

The legislature shall make such further provision by taxation or otherwise as . . . will create and maintain a thorough and efficient system of public schools, adequate to the proper instruction of all youth of the state, between the ages of six and twenty-one years.

[¶ 86] The state contended the constitutional language was plain and unambiguous and limited the state's constitutional obligation to the education of Wyoming's children in the age bracket described. *Manage-*ment Council of the Wyoming Legislature v. Geringer, 953 P.2d 839, 843 (Wyo.1998). We have held that the constitutional age bracket established the upper limit of the state's constitutional obligation to provide for the education of students who were disabled. *Natrona County School Dist. No. 1 v. Ryan,* 764 P.2d 1019, 1024–25 (Wyo.1988); *Natrona County School Dis. No. 1 v. McKnight,* 764 P.2d 1039, 1048 (Wyo.1988).

[¶ 87] The records of our constitutional convention indicate the framers discussed what grades of school must be established. The records indicate the framers did not intend to require the state to provide for grades other than those in existence at the time. The proponent of Art. 7 § 1 is recorded as having said:

I suppose the legislature will make such provisions as will lead to the establishment of grades. It is not supposed that the legislature will interfere with the grades as they are at present, but it has been thought possible that there might be other classes of schools. Schools for manual training have been opened in many places in connection with the public schools. Then there is the kindergarten, for very little children before they are prepared to enter the eight grades which are established almost universally throughout the country.

Journal and Debates of the Constitutional Convention of the State of Wyoming (1889), 729–730.

[¶ 88] The challengers offered impressive, and essentially unrefuted, evidence concerning the positive impact of pre-school on the ultimate educational success of students. While we may agree with the challengers that offering pre-school services to our state's children, particularly for low income students and those deemed at-risk for failure in the school system, is a good public policy decision, it is not ours to make. The challengers contend that because Art. 7 § 1 requires the state to provide a "complete and uniform" education embracing "free elementary schools of every needed kind and grade

12. It is unclear how this issue arose since it was not included in the *Campbell II* mandates. How-ever, we assume it became an issue in the course of the recalibration process.

... and such other institutions as may be necessary," the reference to youths ages 6 to 21 is not a ceiling on that obligation, but only a minimum. They go so far as to suggest that the "ceiling" on the state's obligation concerning the age of students is "infinitely high." We do not believe the constitution can reasonably be interpreted in that fashion. We agree with the district court's legal conclusion that the constitution does not require the state to provide the necessary funds for each district to offer voluntary pre-schools and affirm the grant of partial summary judgment on that issue.

### e. *"Remedy" for Alleged Funding Shortfalls and Attorneys Fees*

[¶ 89] The challengers ask this Court to order the state to pay the attorneys fees they incurred, as they contend, to correct obvious errors and enforcing *Campbell II* mandates. However, they provide no authority for such request and to grant it would be counter to our consistent adherence to the American rule. *Wells Fargo Bank Wyoming, NA v. Hodder*, 2006 WY 128, ¶ 59, 144 P.3d 401, 420 (Wyo.2006) (holding the American rule will be applied when punitive damages were not awarded and no contract or statute provides for such fees). We decline their invitation to enter into such an effort.

[¶ 90] The challengers also seek the "remedy" of reimbursement of costs where they contend the state failed to fund the actual costs the districts incurred to provide the required educational programs. In *Campbell II*, the district court found, and all parties agreed, that an error had been made in the MAP model for the years 1998–99 that failed to account for kindergarten students as one half of an ADM. *Campbell II*, ¶ 106, 19 P.3d at 555. That error caused the total amount of school funding to be short $13,930,000 from the amount the state's model determined was the cost of providing the education required of the state. We ordered that one-time amount to be added to the school operating budget. However, we clearly stated the kindergarten error is not like the other claims based on model adjustment deficiencies. We held, "it is not based on a theoretical or legal dispute. It is an admit-

ted mistake in calculation and recordation at a legislative level. The claim is more in the nature of a request for determination of correlative rights between state entities. *Campbell County School District v. Catchpole*, 6 P.3d 1275, 1287 (Wyo.2000)." *Id.*

[¶ 91] The costs for which the districts seek reimbursement fall into three categories: those components that were deemed constitutional by the district court and affirmed herein; those components that the state ultimately included in its funding model, such as seniority salary adjustments, utilities and health insurance; and the regional cost adjustment that the challengers contend was erroneously implemented and the district court and this Court found problematic. The challengers' claims in this round are not in the nature of the "kindergarten error", but instead are based upon their theories about school funding and their legal claims based on the constitution.

[¶ 92] With regard to the first category, i.e. those components that were upheld by the district court and affirmed herein, their claims obviously fail. The second category, including the seniority cap, utilities and health insurance, involved legal issues. In addition, the legislature acted to remove the seniority cap, funded the actual cost of utilities, and adjusted the health insurance component to keep up with increasing costs. 2006 Sess. Laws, Ch. 37 (eliminated cap); 2006 Sess. Laws, Ch. 37, Attach. A funded actual SY 2004–05 utility expenditures and provided for inflation adjustments. The final category, implementation of the regional cost adjustment, raises greater concern for this Court. We have stated clearly that the manner in which that adjustment was made was not required by *Campbell II*. For whatever reason, those responsible for implementation of the model chose not to apply the adjustment in a fashion that assured the districts would receive at least the minimum cost of education determined by the model. No one defended that adjustment as truly reflecting actual differences in costs between the districts. However, that choice was deliberate and apparently based upon the state's erroneous reading of this Court's opinion. Thus, it is more in the nature of a legal or theoreti-

cal dispute and not a mistake. We view judicial involvement in the legislature's appropriation decisions as an absolute last resort limited to instances where the state itself admits it failed to fund a specific cost of education by mistake, such as it did in the "kindergarten error." In addition, the issue of how to properly account for regional cost adjustments is one of the most complicated issues in the state's model and we believe judicial restraint must be exercised and the details of the solution should be worked out by the experts, subject to the guidelines established in the above discussion on the issue.

[¶ 93] Our approach to other "errors" discovered in the model during this litigation is similar. Given the complexity of the model approach adopted by the state, we are quite certain that such errors will continue to be unavoidable, resulting in minor over-funding or under-funding. We are also quite certain that both the state and the districts will be vigilant in preventing errors and correcting them, if they occur. Having this Court function as an accounting overseer serves no purpose and inappropriately injects the judiciary into executive and legislative branch functions.

## II. CAPITAL CONSTRUCTION

### 1. *Procedural Background*

[¶ 94] The constitutional concerns caused by inadequate resources and wealth-based disparities have dramatically impacted school construction and maintenance since the early 1970s. Historically, school construction was financed entirely through property taxes and the funds available varied widely from county to county as a result of the differing assessed values of property in each county. In 1980, we held that system violated the state's constitution and mandated "statewide availability from total state resources for building construction or contribution to school buildings on a parity for all school districts." *Washakie*, 606 P.2d at 337. *Campbell I* reviewed the legislative changes made in response to the *Washakie* opinion and found that the combination of loans and grants had not adequately addressed the deficient public school facilities which the state itself had

identified. We declared that system unconstitutional. *Campbell I*, 907 P.2d at 1275. In response to that opinion, the WDE financed a study to score all buildings in each school district based on various categories of capital construction needs. This report, generally identified as the Wyoming Department of Education Statewide Schools Facilities Assessment, identified certain schools in immediate need of capital construction. In 1999, the legislature acted to address the constitutional infirmities of the school capital construction statutes and enacted Wyo. Stat. Ann. § 21–15–111 (Lexis 1999), which established a process whereby school districts could receive state funding for capital construction of school facilities. However, that statute required the districts to certify they had used 90% of their bonding capacity authorized by Art. 16, § 5 of the Wyoming constitution before they would be eligible to receive state funding. In *Campbell II*, we concluded that § 21–15–111 was unconstitutional because it again resulted in wealth-based disparities in school construction financing. *Campbell II*, ¶ 11, 19 P.3d at 556. As a result of that decision, in 2002, the legislature completely overhauled the statutory scheme for capital construction of public schools and created a statewide program for funding construction of facilities necessary to meet state-determined adequacy standards. Wyo. Stat. Ann. §§ 21–15–101 to 21–15–121 (LexisNexis 2002). *Snell v. Johnson County School Dist. # 1*, 2004 WY 19, ¶ 5, 86 P.3d 248, 251 (Wyo.2004).

[¶ 95] The *Campbell II* and *III* decisions determined that a proper education could not be adequately delivered to children who attended schools that had long been denied adequate maintenance and construction funding. Legislative studies, experts and consultants, as well as school district reports, identified and proved what was known anecdotally by parents, teachers and students that, throughout the state, seriously deficient buildings were negatively impacting the quality of education. Neither funding nor planning existed to timely remedy the situation and this constitutional inadequacy resulted in this Court's 2001 *Campbell* decisions requiring the legislature to adopt a

plan to remedy capital construction deficiencies and resolve immediate needs within two years and other critical areas within four years. The ultimate test of success would be whether educational facilities were replaced or repaired sufficiently to require only routine maintenance, a term easily defined by industry and building standards.

[¶ 96] In 2005, that overhauled system was reviewed by the district court, which made findings of facts and conclusions of law. The district court had been notified by the state that it had not met the mandate to remedy immediate need facilities within two years. The state informed the district court that the overall condition of facilities throughout the state required considerable effort to meet this Court's mandate and the mandate had not been achieved.

[¶ 97] Since the legislature began using MGT as its primary consultants to study and quantify needs, the evidence and our past decisions have quantified and tracked the inadequacies of capital construction funding by relying upon its efforts. In 1992, MGT identified capital construction needs at $275 million. At the time only $5 million was designated as capital funding. In 1992, LCSD# 1 needed a new high school estimated to cost $30 million; however, no funding was available. No funding at all was appropriated between 1995 and 1998 for capital construction across the state. Maintenance funding needs went unmeasured. By 1999, however, all needs had been measured in 1998 dollars and the state had determined that decades of previous non-funding of school capital construction now required $868 million to correct deficiencies. Nevertheless, the legislative process had generated very few dollars at the state level and only $30 million was actually appropriated by the legislature between 1998 and 2001. After the 2001 Campbell decisions, the state learned that the building conditions were even more dire and contends that the legislature appropriately responded by developing a constitutional school system driven by well-founded educational standards, not arbitrary fiscal policies. The state claims that the legislature enacted a separate statutory structure dedicated solely to capital construction funding, building and maintenance and, then, appropriated almost a billion dollars from state wealth. The state contends that this system is adequate, thorough and equal.

[¶ 98] The legislature did act and was fortunately enabled by large surpluses made available for state spending due to the national energy boom in which Wyoming has participated. Since 2002, the legislature has earmarked approximately $990 million for school capital construction funding and placed large sums in the projected capital school construction account. By the time the trial was held, however, very little had been spent. In fact, so little was spent that the school construction account balance grew sufficiently large that the legislature transferred funds out of that account and into a budget reserve account.

[¶ 99] The legislature not only appropriated funds but also created the SFC, with the specific function and responsibility of implementing capital construction. The legislature directed school districts to produce a five-year-plan for prioritizing and addressing all capital construction needs. The SFC was instructed to focus and streamline school district planning into a comprehensive statewide strategy; to adopt rules and regulations to oversee school construction and maintenance; to spend the large amounts of funding specifically earmarked for building new schools; and to coordinate major maintenance projects costing over $200,000 each, as well as minor maintenance projects. Although a substantial portion of the funds have not been spent and were at one time transferred back out of school construction funding, the SFC believes that sufficient funds are obligated to school maintenance and construction.[13]

[¶ 100] Despite all this activity by the legislature, the state concedes that the *Campbell II* mandate of fixing facilities in

---

13. The district court made no finding otherwise. The challengers claim that the school capital construction account had more than sufficient funds to provide for a much more extensive capital construction program but poor planning and budgeting by the SFC during the 3–5 years prior precluded project completions.

immediate need has not been met. The challengers claim that the state made no effort to comply with the mandate and has stopped tracking work on immediate need and inadequate facilities and supplied only a partial list of buildings identified as remaining in the immediate need category. The challengers provided an assessment of the overall lack of progress by the state in the categories of immediate need, inadequate technology readiness, educational suitability and building accessibility for student-related buildings and non-educational buildings by estimating the total number of buildings that probably remain in each category. What neither party showed, however, was how the five-year-plan prioritized those projects and proposed meeting the mandate for immediate need facilities. The district court resolved this lack of evidence by holding that the state had not met the mandate but determined the remedy required was a case-by-case resolution. The district court also concluded the SFC guidelines failed to provide for adequate space for student activities, long distance learning, and computer space, and failed to pay for utility lines and roadways to school sites where future schools were to be built. In addition, it concluded vocational education requirements should be based on a case-by-case determination of need.

[¶ 101] We agree with the district court that the state's failure to comply with the mandate and the remaining demonstrated inadequacies require a new approach. We regret that so many children have passed through facilities requiring major repairs or replacement; however, our review of the evidence discussed below persuades us, as it did the district court, that the state has acted in good faith in trying to meet the mandate through research-based policy making, statutory enactment and appropriations of large sums. We have carefully examined the constitutionality of the statutory and regulatory schemes enacted since the mandate was imposed and find that these deficiencies and failures are not the result of an unconstitutional system. Instead, they result primarily from the administrative and logistic challenge created by the size of the problem created by years of neglect. We believe the

appropriate remedy is that directed by the district court, a case-by-case review.

[¶ 102] The state responded to the deadlines in *Campbell II* with urgency and expended Herculean efforts to create a new agency, determine construction guidelines and implement a massive funding process. For some, the state moved too slowly and failed to make adequate funds available soon enough. Certainly that is true for those students who have passed through the state's schools over the last six years. However, the only rational reaction to the state's efforts is to applaud the state and encourage its continued progress. We hold that the state's failure to meet the precise deadlines of *Campbell II* and *III* should not result in any action by this Court. At this point in time, we are convinced the state is moving forward as quickly as can be expected.

### 2. *Constitutionality of Current Statutory Scheme*

[¶ 103] *Campbell II* and *III* ruled that a capital construction funding formula would be constitutional when it complied with specific mandates. Those mandates are listed below and from them we must test the legislature's statutory and regulatory structure. The state has complied when:

1.  The legislature has funded the facilities deemed required by the state for the delivery of the required educational programs to Wyoming students in all locations throughout the state.

2.  The legislature has enacted a comprehensive plan, separate from operations, to provide adequate funding for adequate facilities from state wealth;

3.  The legislature measures an adequate facility as one requiring only routine maintenance, although it may utilize different methodologies to measure adequacy.

[¶ 104] A review of the legislation adopted in response to *Campbell II* and *III* demonstrates compliance with these mandates. In its statutes, the legislature defined school buildings and facilities as the physical structures and the land upon which the structures are situated, which are primarily

used in connection with or for the purpose of providing the educational programs offered by a school district in compliance with law, including both student-related and non-student-related buildings and facilities. Section 21–15–111(vi).[14] In addition, the statute directing the SFC to develop standards for the adequacy of school facilities refers to "buildings and facilities necessary for providing educational programs prescribed by law." Section 21–15–115(a). No statute specifically describes those educational programs that will be "in compliance with law" or "prescribed by law." The minimum uniform performance standards for this state's educational program are set forth at Wyo. Stat. Ann. § 21–9–101 (LexisNexis 2007), and that statute requires school districts to design, develop and deliver the educational programs required to meet those standards. We find that "educational programs in compliance with law" or "prescribed by law" logically also means programs contemplated by WDE rules and regulations and authorized by the operation funding model, which is incorporated by reference into the statutes. Section 21–9–101 [15]; Wyo. Stat. Ann. § 21–2–203(a) [16]

14. "School buildings and facilities" mean the physical structures and the land upon which the structures are situated, which are primarily used in connection with or for the purpose of providing the educational programs offered by a school district in compliance with law, including both student-related and non student-related buildings and facilities[.]

15. Educational programs for schools; standards; core of knowledge and skills; special needs programs; class size requirements; co-curricular activities.

(a) The board of trustees of each school district within the state shall cause the schools under its jurisdiction to provide an educational program in accordance with uniform standards defined under this section and rules and regulations promulgated by the state board of education pursuant to W.S. 21–2–304(a).

(b) Each school district within the state shall provide educational programs sufficient to meet uniform student content and performance standards at the level established by the state board of education in the following areas of knowledge and skills:
    (i) Common core of knowledge:
      (A) Reading/language arts;
      (B) Social studies;
      (C) Mathematics;
      (D) Science;
      (E) Fine arts and performing arts;
      (F) Physical education;
      (G) Health and safety;
      (H) Humanities;
      (J) Career/vocational education;
      (K) Foreign cultures and languages;
      (M) Applied technology;
      (N) Government and civics including state and federal constitutions pursuant to W.S. 21–9–102.
    (ii) For grades one (1) through eight (8), reading, writing and mathematics shall be emphasized under the common core of knowledge specified under paragraph (b)(i) of this section;
    (iii) Common core of skills:
      (A) Problem solving;
      (B) Interpersonal communications;
      (C) Keyboarding and computer applications;
      (D) Critical thinking;
      (E) Creativity;
      (F) Life skills, including personal financial management skills.

(c) In addition to subsection (b) of this section, each school district within this state shall provide programs designed for the special needs of those student populations specified within this subsection. Programs under this subsection shall be provided and shall identify special student populations in accordance with rules and regulations of the state board of education. The state board shall monitor the proportion of students in each special needs category, compared to available regional averages. Special needs student populations include:
    (i) Children with disabilities evaluated in accordance with rules and regulations of the state board as having mental retardation, hearing impairments including deafness, speech or language impairments, visual impairments including blindness, serious emotional disturbance, orthopedic impairments, autism, traumatic brain injury, other health impairments, specific learning disabilities, deafness and blindness or other multiple disabilities, and who, because of the impairments, need special education and related services; and
    (ii) Gifted and talented students identified by professionals and other qualified individuals as having outstanding abilities, who are capable of high performance and whose abilities, talents and potential require qualitatively differentiated educational programs and services beyond those normally provided by the regular school program in order to realize their contribution to self and society.

(d) In addition to subsections (b) and (c) of this section, each school district within this state shall endeavor to maintain when practicable, in kindergarten through grade three (3) within the district, an average class size of no more than twenty (20) students per teacher, excluding children with disabilities who spend more than fifty percent (50%) of their time outside of regular classroom instruction.

(LexisNexis 2007); § 21–13–309 [17], as well as those programs for which federal funding is accepted. Clearly, the legislature has authorized or "prescribed" programs beyond those necessary to achieve the minimum proficiency standards under § 21–9–101. By including expenditures in the model for specific educational programs, it is presumed the legislature intended to authorize delivery of those programs. We conclude that the legislature intended the school districts to provide educational programs whether required by § 21–9–101, or authorized by the model, or funded by federal funds, and these educational programs would then be "in compliance with" or "prescribed by" the law. School facilities providing these educational programs are entitled to capital construction and maintenance funding from state wealth.

[¶ 105] To ensure adequacy and equity of school facilities, the legislature enacted a statute requiring the SFC to "by rule and regulation establish and maintain uniform statewide standards for the adequacy of school buildings and facilities necessary for providing educational programs prescribed by law for the public schools." Section 21–15–115(a).[18] The SFC and school districts were directed to evaluate and prioritize all needs, first through a five-year-plan and then through annual assessments based on this legislative mandate:

(a) Through the identification of school building and facility conditions and needs provided by the assessment conducted and maintained under W.S. 21–15–115, and a comparison of the identified conditions and needs with the established statewide building adequacy standards and the district facility plans submitted under W.S. 21–15–116, the commission shall annually in coordination and cooperation with the districts, evaluate the adequacy of school buildings and facilities within local school districts, and based upon this evaluation, establish a schedule for building and facility remediation. Remediation shall bring all buildings and facilities to conditions such that over time, only routine maintenance is required to maintain building adequacy.

Section 21–15–117(a). Annually, the SFC is to report to the legislature's Select Committee on Education (SCE) on all aspects of school facilities needs including buildings deemed inadequate, expenditures, progress and upcoming budgetary needs. Section 21–15–121. As we noted in the first paragraph of this opinion, under the state constitution, the legislature is ultimately responsible for education. The inclusion of legislative oversight and involvement is crucial to a constitutional statutory scheme. Although the legislature may involve school districts and agencies such as the SFC for parts of the system, that does not lessen legislative responsibility for the entire system. The legislature must be actively involved, as it has been, and aggressively monitor the SFC to ensure the capital construction system does not fail. Since *Campbell II*, this particular committee has acted responsibly and positively on MAP recommendations on the school operations side as well as on MGT recommendations on capital construction to-

(e) Nothing in this section shall be construed to prohibit school districts from establishing co-curricular activity programs which have as their purpose to provide educational experiences not otherwise provided by the local district. The legislature specifically encourages school districts to establish programs of this type.

(f) It is the intent of the legislature that the funding mechanism established by law for schools encourage school districts to achieve the goal of reduced class sizes.

(g) Not later than the 2002–2003 school years, all school districts shall provide instruction in foreign languages to students in kindergarten through grade 2 in accordance with standards promulgated by the state board.

16. School district data collection and funding model administration; duties and responsibilities

specified; data advisory committee; school district compliance.

(a) The department shall collect data for the state's school finance system and in accordance with rule and regulation of the state superintendent, administer the Wyoming education resource block grant model adopted by the Wyoming legislature pursuant to W.S. 21–13–309.

17. Section 21–13–309 lists the computations under the model and the actual cost funding to be delivered through the foundation program for each district.

18. The commission shall by rule and regulation establish and maintain uniform statewide standards for the adequacy of school buildings and facilities necessary for providing educational programs prescribed by law for the public schools.

wards compliance with the Campbell decisions. We, therefore, believe this method of legislative oversight reliably serves the delivery of a constitutional education.

[¶ 106] Testing this statutory scheme against the *Campbell II* mandate, we do not find nor does any challenger contend that this legislative statutory plan contains the previous infirmities that defeated constitutionality. It provides for capital construction funding from state wealth without reliance upon local wealth as a source of capital; mandates facilities be remedied to a point requiring only routine maintenance; and most importantly, makes adequacy of facilities a function of delivering adequate educational programs. No challenger contends that the appropriated funding in total [19] is inadequate or is improperly diverted to other school operations needs.

[¶ 107] The legislature has enacted a comprehensive, constitutional statutory plan for school capital construction. The chal-

lengers identify two deficiencies related to implementation: few immediate need facilities have been remedied and very little of the funding appropriated has actually been spent. We agree with the challengers that these deficiencies are disturbing but our review does not show that they result from inactivity. With regard to addressing facilities in immediate need, the legislature chose to rely upon its methodology of a five-year-plan to prioritize needs and an annual evaluation to assess progress.[20] Our review shows that the legislature always prioritized needs and emphasized progress in these areas. It instructed the SFC that, in implementing this plan, immediate needs were to be addressed first, particularly for those buildings used as classrooms for students.[21] Since the trial, the state has informed the Court that the legislature has acted to increase the speed of repair or replacement and continues to appropriate large sums. 2006 Sess. Laws,

---

19. The challengers' contention that insufficient funding has been spent for immediate need facilities is addressed in a later part of the opinion.

20. In its brief, the state shows that effective July 1, 2006, amendments to Wyo. Stat. Ann. § 21–15–116, eliminated the five year provision and required redevelopment of the district facility plan every two years or on a schedule otherwise established for the district by the commission. 2006 Sess. Laws, Ch. 42, § 1.

21. This process appears to be underway. In rules adopted in 2006, the SFC identifies and prioritizes needs as either critical or necessary. SFC Rules & Regs., Ch. 6, §§ 3–5. On January 20, 2006, the SFC reported to the legislature's joint appropriations committee that over $200 million was required to resolve critical needs. SFC 2007/2008 Budget Presentation, http://sfc.state.wy.us/pdf/JACPresentation2006.pdf. Critical needs are those the Commission deemed most important and to be accomplished as soon as feasible.

Section 4. Priority Group 1—Critical Projects.
  (a) This priority group includes those projects that the Commission determines to be most important and to be accomplished as soon as feasible. Per W.S. 21–15–117(a)(iv) priority will be given to educational buildings. The following are the types of projects that are included in priority group 1:
    (i) Health and safety projects. Those that include improvements to protect the health and safety of its occupants include those involving structures serviced by a water supply that is contaminated or failing, structures having egress

that endangers student safety, structures having significant potential for structural failure, and structures requiring installation of emergency systems.

* * *

The details were provided earlier to the legislature's select committee on school facilities on January 11, 2006 where the minutes state in relevant part:

  Director Shivler reviewed the School Facilities Commission 2007–2008 biennial budget request, a copy of which was distributed and is attached as Appendix D. Director Shivler reported the total bonding capacity of the state is around $300 million compared to a total biennial budget request by school districts of $673,055,123. With this in mind, the Commission prioritized the capital construction projects in accordance with its rules and regulation and is forwarding priority 1 projects for a total capital construction request of $220,652,041 plus an additional $14,000,000 in contingency and value engineering funding. All minor capital construction projects were brought forward in a total funding request of $36,194,644. Also included in the 2007–2008 biennial request is the Commission's operating budget of $7,350,256, review and analysis funds totaling $60,000,000, emergency funding at $1,000,000, major maintenance program funding of $68,200,000 and a proposed project opportunities fund of $134,000,000, all resulting in a total budget request of $541,396,941. Select School Facilities Committee Minutes, Jan. 11, 2006, http://legisweb.state.wy.us/ 2005/interim/schoolfac/MINUTES/min0111.htm.

Ch. 35, § 27. This continued aggressive legislative oversight over capital construction is obtaining results as part of a constitutional statutory scheme.

### 3. Constitutionality of Current Regulatory Scheme

[¶ 108] The legislature's constitutional statutory scheme directed the SFC to adopt rules and regulations to accomplish statutory directives for major and minor maintenance as well as building remodels, additions and construction. The SFC deliberately chose to call its rules and regulations "guidelines" to avoid inflexibility. Those guidelines govern the maintenance funding discussed earlier and major capital renovations and building replacements through a school district's five-year-plan developed pursuant to § 21–15–116.

[¶ 109] The guidelines provide for project approval and state funding as well as regular maintenance payments based upon total square footage within a school district. For construction of a new school, however, the heart of the guidelines is the prototypical models included for elementary, middle and high schools at specified student populations. Each model lists the types of spaces the SFC deems most likely required in a school setting and sets a square footage allotment. The school districts must look to the particular model to determine the square footage allotment and a cost per square foot that the building project may not exceed without SFC permission. The school districts, not the SFC, design the classrooms, laboratories, physical education areas, etc., required for delivery of their educational programs. Designs that exceed either the square footage allotment or cost allowed by the SFC must be approved by the SFC through the grant of an exception.

[¶ 110] The statute provides for administrative review when the SFC rejects or modifies a school's five-year-plan but does not specifically provide for administrative review of any other kind of SFC decision such as denials of exceptions. The evidence at trial showed that school districts were primarily concerned that none could obtain swift, reasoned decisions for denials of exception requests for square footage allotment increases or for rejection of contractor bids for a project. Bid rejections were particularly frustrating because they often came at the end of a three to five year process of designing, planning and gaining approval of a project with which the community had become deeply involved. The bid rejections were most often caused by the SFC's failure to adequately provide for inflation of project costs during the long review process. The district court ruled that any inadequacies specific to a certain project were properly resolved by exhaustion of administrative remedies for which there would then be judicial review. It is unclear from its ruling whether the district court determined that the school districts were entitled to contested case proceedings or simply the judicial review provided to a person aggrieved by agency action set forth in Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2007). As the district court found, a school district[22] can seek judicial review under § 16–3–114(c). However, neither statute nor rule provide for an administrative process that will develop a factual record on the many issues that may arise in the complex, time-consuming task of each building or major maintenance project. Nevertheless, the state contends that such a process exists for review of denials of exception requests and other issues not concerning constitutionality of a statute or rule and that the SFC is not permitted to simply deny an exception or increased project funding request. The state also contends that the SFC provides, through an informal process, the development of a factual record, and issues a swift, reasoned decision that can be reviewed in court pursuant to § 16–3–114. We accept the state's contentions as true.[23]

---

**22.** A school district is a governmental subdivision and therefore a person. *Pritchard v. State, Division of Vocational Rehabilitation, Dept. of Health and Social Services,* 540 P.2d 523, 530 (Wyo.1975).

**23.** Section 21–15–118, in relevant part, directs that the SFC "[w]ith the assistance of the involved school district, develop and approve the necessary schematic design documents as well as cooperate on several other aspects of the construction process.

[¶ 111] The district court held that the SFC guidelines are facially constitutional. This decision is apparently based upon acceptance of the state's evidence that the guidelines are not standards or "rules that cannot be changed." The author of the guidelines, Dodds Cromwell of MGT, testified that the term "guidelines" was intentionally used to avoid an invariable or mindless application of the models without regard to adequacy and equity requirements. He testified that both adequacy and equity requirements were best met by viewing the guidelines as flexible for each construction project. Several stages for individualizing construction projects, one of which he described as a value engineering process, were in place including allowing a school district to request that the SFC grant an exception as needs were identified during each stage. Mr. Cromwell explained that the guidelines were developed to recognize and accommodate both state and federal law changes that might impose educational program requirements such as the federally required Title I reading rooms that may not be part of the prototypical model, but yet a new school construction would have to include. He testified the guidelines anticipated yearly changes and intended to incorporate them through the exception process.

[¶ 112] Mr. Cromwell described a regulatory scheme designed to adequately and equitably provide for constructing and maintaining facilities throughout the state. Applied flexibly to accommodate the changing educational programs authorized by state law, or for which federal funding was accepted, the provisions are capable of serving this intended purpose at state expense without causing wealth-based disparities. We agree with the district court that this regulatory scheme as explained by Mr. Cromwell is facially constitutional.

[¶ 113] However, the evidence was overwhelming that the SFC has not implemented

its guidelines in this fashion. The challengers presented evidence that the SFC has rigidly applied the guidelines and has routinely denied requests for exceptions telling school districts that the guidelines do not allow for any deviation through an exception.[24] We can find no explanation for this approach in the record and it creates the possibility that the implementation of the guidelines is contrary to the statutory scheme adopted by the legislature which we have just held is constitutional.

### a. *Adequacy of Guidelines*

#### i. *Educational Facilities*

[¶ 114] The state provided testimony concerning the process followed to draft the guidelines. The testimony showed that MGT reviewed guidelines prepared by the WDE and a steering committee which recommended a much more generous square footage allotment than that ultimately used; however, the district court determined that the square footage number was arrived at by study and comparison to facilities in other states. The challengers claimed MGT ignored input from educators and experts from across the state and, as a result, the square footage allotments were inadequate to, in many cases, provide the programs they had historically provided to their students, and hence, the guidelines were inadequate. The district court found the guidelines adequate with a few exceptions. Although it does appear from the evidence that the SFC was very conservative in its determination of the appropriate square footage allotments, we conclude the district court's findings were not clearly erroneous and any specific shortcomings can best be addressed on a case-by-case basis.

[¶ 115] The district court found that the SFC must pay for off site development of utilities and streets to connect to

---

24. In a May 24, 2004, letter to LCSD # 1, the chairman of the SFC, Jeff Marsh, stated that the Commission did not have authority to add facilities beyond approved guidelines and any changes required would be treated as an enhancement for which the districts would have to pay. In his testimony, the state's expert, Mr. Cromwell, stated that he was not aware of a single example

where the SFC had deviated from its guidelines in terms of allowing excess square footage that was not considered an enhancement. Schools have used local bonding to pay for science rooms, vocational education programs, physical education rooms, multi-purpose rooms, special education rooms, and Title I reading rooms.

new school construction. When local governments require construction of such infrastructure, schools cannot be built without them, and we agree with the district court's conclusion and hold that the state must fund the school district's fair share of the infrastructure necessary for the school to operate from state wealth. We recognize that such funding may be affected by the design, location, and timing of school construction.

[¶ 116] The district court also found that the SFC guidelines did not provide space for long distance learning and computer education although these two programs were specifically required by the state for all schools. The district court ruled that space must be included as part of the guidelines, and we again find the court's findings are not clearly erroneous.[25]

[¶ 117] Other space shortages identified by the challengers included insufficient science laboratories, auditoriums, vocational education rooms and other educational programs in existence that might be eliminated under the SFC guidelines. This dispute arises from the SFC's limitation of allotments to subject areas listed in § 21–9–101. As we discussed earlier, the legislature intended for schools to provide educational programs prescribed by or in compliance with the law whether required by § 21–9–101, or authorized by the model, or funded by accepted federal funds. School facilities necessary to provide those educational programs are then entitled to capital construction and maintenance funding from state wealth. Accordingly, the SFC cannot fail to provide such necessary facilities or it is acting contrary to law. All of the various laws that require and authorize the school districts to develop educational programs must be considered in determining what capital facilities are required. Because the legislature, by

statute, has left it to the school districts to design those educational programs, the SFC will be reviewing school designs that vary from district to district, necessitating it to decide the appropriate square footage needed on a case-by-case basis. Ultimately, the test of whether the SFC acted properly in approving or rejecting proposed school facilities will be whether adequate space is provided to allow the school to provide authorized programs. To do so, the SFC necessarily must determine, based on the evidentiary record and the guidelines, how much and what type of space is required for those programs.

### ii. *Student Activities*

[¶ 118] The district court concluded, without much explanation, that the SFC did not provide adequate facilities for school activities. There is no dispute that facilities must be provided for some level of student activities.

[¶ 119] In 2005, MAP justified its long time inclusion of student activities in the operation funding model based on research and evidence and reported that:

Elementary, middle and high schools typically provide an array of after school programs, from clubs, bands, and other activities *to sports.* Teachers supervising or coaching in these activities usually receive small stipends for these extra duties. Further, research shows, particularly at the secondary level, that students engaged in these activities tend to perform better academically than students not so engaged, though too much extra curricular activity can be a detriment to academic learning.

2005 Recalibration Report, 101 (emphasis added). Student activities including sports are important not just for the general student population but also for special needs

---

**25.** We were unable to determine the status for correcting this deficiency although we found this reference in the minutes of a legislature select committee meeting held on Sept. 26, 2005. *Off Site Developments.* Director Shivler brought to the attention of the Select Committee the fact that the Commission is not currently providing funds to school districts for off-site developments such as sidewalks, curb and gutter, street lights, traffic lights, intersection improvements and wa-

ter and sewer lines. These expenditures are becoming substantial to impacted communities. Recently Cheyenne was quoted $6.2 million for sewer and water lines and street infrastructure necessary for the completion of a new school. The Commission recommends the establishment of a state level funding mechanism for this purpose which is outside of the Commission's jurisdiction.

and at-risk students. In the same report, MAP determined from its research and evidence that an important component of an effective strategy for properly educating at-risk students includes two hours per day of non-academic activities during summer school programs. *Supra* at 64. This Court has previously determined that co-curricular activities are part of the free appropriate public education which is guaranteed by the IDEA, a federal law. *Koopman By and Through Koopman v. Fremont County School Dist. No. 1,* 911 P.2d 1049, 1053, (Wyo.1996). *See Crocker v. Tennessee Secondary School Athletic Association,* 873 F.2d 933 (6th Cir.1989); *Rettig v. Kent City School District,* 788 F.2d 328 (6th Cir.), *cert. denied,* 478 U.S. 1005, 106 S.Ct. 3297, 92 L.Ed.2d 711 (1986); *Hollenbeck v. Board of Education of Rochelle Township,* 699 F.Supp. 658 (N.D.Ill.1988). The state has determined that student activities are part of a proper education for all children under both federal and state law, and, as the challengers contend, *Campbell II and III* mandate that appropriate school facilities accommodate those student activities.

[¶ 120] The district court found that the guidelines were deficient for not accommodating "cocurricular activities", a term found in § 21–9–101, but not defined. That statute specifically encourages districts to implement cocurricular programs that provide "educational experiences." Section 21–9–101(e). The district court found that the guidelines provided space only for assembly and physical education and no evidence explained how the guidelines provided space for cocurricular activities. However, the specific deficiencies that concerned the district court were not explained.

[¶ 121] The district court also concluded that school sports were "extracurricular," and not "cocurricular" activities, and were not expressly provided for by statute. However, the legislature did not exclude athletics from "cocurricular" activities and authorized funding for them in the assumptions underlying the MAP model block grant. In 1997, the legislature directed the state superinten-

dent of education to identify and determine student activities, without excluding athletics, to be included in the model. 1997 Spec. Sess. Laws, Ch. 3, § 202(e). The record shows that the superintendent advised that, for high schools, local and national activities had been identified and among those were activities governed by the Wyoming High School Activities Association (WHSAA).[26] The model provides funding for student activities in all schools in general as a line item and provides funding for athletic directors and activities directors where necessary. The WDE rules regulate student activities and have categorized them as elementary, junior high or high school.

[¶ 122] The districts testified that since 1997 they have offered cocurricular activities in high school sanctioned by the WHSAA but will also look to other sources on both a local and national level if not provided for by the WHSAA. The record shows that athletic programs are included in those sanctioned by the WHSAA. We did not see that athletic programs outside of WHSAA are offered in Wyoming schools. According to the challengers, WHSAA sanctions activities such as Future Farmers of America, Future Business Leaders of America, student council, band, cheerleading, football, volleyball, basketball, tennis, swimming, and other traditional competitive sports.

[¶ 123] Interestingly, SFC guidelines seem to be consistent with this approach of including athletics in the category of cocurricular activities, and accommodate some types of sports in the square footage allotments. They allow funding for a gym for certain types of schools but not all, although the SFC recently decided that it would make sure one gym was provided per community. SFC Guidelines, Ch. 4. Funds are allowed for track and soccer fields, but not for lighting, seating, or restrooms for those fields. No swimming pools are allowed for any new construction.

[¶ 124] The state contends that the SFC may exclude or restrict student activity facili-

---

**26.** WHSAA, a nonprofit regulatory group, has been in existence since the 1920s. Membership is voluntary. Because it sponsors fine arts, lead-

ership, vocational education, and athletics, WHSAA calls its programs "cocurricular activities."

ties or amenities because students can access those facilities with full amenities either through recreational centers or at other schools in the community. The state contends that student access to activities and their facilities is adequate and equitable. We agree with the state that this would be so if the SFC had been making those determinations; however, the evidence supports the challengers' contention that the SFC has not been reviewing particular projects to ensure adequate and equitable access. It appears to have denied state facility funding for student activities without regard for access and availability.

[¶ 125] We note that neither the constitution nor the legislature requires specific athletic programs or activities be provided to all students. Instead, the legislature has left to the school districts the decision of what cocurricular activities should be offered. Section 21–9–101. Since 2003, the model has funded student activities at $250 per ADM, meaning the state is funding the average activities, including athletics. Accordingly, the SFC is required to provide facilities to house an average number and variety of activities, including athletics. To avoid educational opportunity disparities, the SFC is required to ensure that substantially similar activities will be provided to similarly situated students across the state. The constitution does not require all facilities for student activities be exactly the same, especially considering the wide variety of possible activities and local preferences, or funding of facilities desired by a community to allow the public to be involved in such activities. We agree that reasonable access to substantially similar activities and their facilities determines the equity and adequacy of student activity facilities. That determination must be made on a case-by-case determination. The SFC must develop a factual record on the issue for a school's particular project and make a reasoned decision that students will receive access to substantially similar activities and facilities received by similarly situated students.

### iii. *Local Enhancements*

[¶ 126] The SFC guidelines define local enhancements as anything exceeding SFC guidelines and require that local enhancements must be paid for by a school district through local bonding. As just discussed, if the SFC improperly limits the educational programs requiring space, it shifts costs of facilities to deliver those programs to local school districts which then have to rely upon local bonding. The natural result is wealth-based disparities created within a constitutional regulatory scheme enabled by a constitutional statutory scheme. This approach of unconstitutional cost shifting is new to this Court; however, the term "local enhancement" is a concept first examined in *Campbell I.*

[¶ 127] *Campbell I* recognized that local enhancements had an important role to play in improving and maintaining educational quality. It found that local school districts have a constitutional right to have a role at the local level whether in the form of optional mill levies or bonding. *Campbell I*, 907 P.2d at 1274. *Campbell II* discussed this concept after deciding the term "local control" could only mean a "local role" in implementing a legislatively defined proper education. Because school districts felt strongly that state control might result in "dumbing down" the education provided to students, *Campbell I* defined the state's standard as the *"best* we can do" and then provided for "local enhancements" to ensure that deciding what a "proper" education was would remain dynamic and continue to evolve.[27] *Campbell I*, 907 P.2d at 1274.

27. *The Constitutional Local Level Role*

As the district court found, the evil of the optional mill levy was its impact upon "basic" equal educational opportunity. In view of the constitutional requirement that the state provide a uniform, "proper" education program, the question arises whether the legislature can permit optional mill levies so the local school district can raise funds outside of the state foundation program in order to enrich its students' educational opportunities beyond those offered elsewhere in the state.

The constitution requires the legislature to create and maintain a system providing an equal opportunity to a quality education. That system must be a function of state wealth. Once the legislature achieves the constitutional mandate of a cost-based, state-financed proper education,

[¶ 128] Regarding capital construction, *Campbell II* clearly allows a school district to build facilities considered innovative or world-class with money raised locally or by property taxes not subject to recapture under the constitutional provision and then leaves it to the legislature to ensure that type of local enhancement does not ultimately create a disparity in equal educational opportunity. *Campbell II's* discussion about a "local role" contemplated that, by requiring the legislature to define and fund the "proper education," the role of a local school district would necessarily change from primarily deciding how to pay for the "proper education" with inadequate funds to the new and necessary role of raising funding for "local enhancement" in order to assure innovation.

[¶ 129] As our decisions show, we have concluded that the constitution contemplates each school district will have an equal *opportunity* to innovate for the purpose of exceeding the state educational system. Unlike the approach of not permitting any variance in the educational program because it would necessarily cause actual educational experience differences across the state, this Court determined that so long as every school district had the same opportunity for innovation, local enhancement represented a compelling state interest that would survive strict scrutiny. Our concern was plainly on protecting the opportunity for "innovation" which means new, modern, improved, advanced and original. In the past, we have seen many "innovations" by local schools such as advanced placement classes, international baccalaureate classes, and full day kindergarten, all of which are now part of a proper statewide education.

[¶ 130] The SFC definition of local enhancement states:

"Local Enhancements to School Buildings and Facilities" or Local Enhancements" means any renovation, construction, replacement, repair or other improvement of or to any school building or facility initiated by a school district which is designed to bring the building or facility to a condition exceeding the statewide building adequacy standards contained in the commission guidelines.

SFC Rules and Regs., Ch. 1, General Provisions, § 2(ff) (12/8/04). Plainly, the SFC definition focuses on whether the local enhancement would exceed the state system as presented in the SFC guidelines. This definition is permissible if the SFC guidelines are building an adequate facility at state expense. As the district court found, this may not be the result on a case-by-case basis.

[¶ 131] The legislature has empowered and commanded the SFC to build adequate and equitable facilities capable of delivering the educational programs prescribed by laws and state standards. Anything desired by the school districts over and above that is a local enhancement for which local bonding will be required.

[¶ 132] We are aware that the legislature is concerned with where to draw the line and believes examples of excess might include wealthy districts potentially creating new standards for the entire state in areas such as sports by building golf courses for their golf programs or lavish domed arenas with local wealth. Gratuitous luxuries are conceivable, but are not an educational innovation that will raise the bar for the rest of the school districts. Nowhere in the record does it show that these types of facilities are called for to deliver a thorough and efficient education. The state's own experts at MAP stated that too many extracurricular activities are harmful and it can reasonably be inferred that such inappropriate expendi-

then assuming the legislature has a compelling reason for providing a mechanism by which local districts may tax themselves in order to enhance their programs in an equitable manner, that appears to be constitutionally permissible. However, we inject two notes of caution. First, in *Skeen*, the two dissenting state supreme court justices did not believe strict scrutiny permits a local enhancement mechanism. *Skeen*, 505 N.W.2d at 322 (Page, Gardebring, JJ., dissent-

ing). Second, local enhancement may also result in substantive innovations which should be available to all school districts as part of a proper education. The definition of a proper education is not static and necessarily will change. Should that change occur as a result of local innovation, all students are entitled to the benefit of that change as part of a cost-based, state-financed proper education.

tures to accommodate or house activities is just as harmful. No facts, laws, or adequacy tests require these types of facilities.

#### 4. *Case–By–Case Review*

[¶ 133] In the future, the SFC must properly implement its guidelines in accordance with the statutes and consider exception requests in light of this opinion. Judicial review of administrative decisions is well-established and the SFC can easily learn that courts will uphold those decisions that are not conclusory but are well-reasoned based upon consideration of proper basic and ultimate facts. This opinion defines the facts that should be gathered, the laws that should be applied, the tests that should be administered, and the reasoning necessary to reach a written decision that can be upheld upon judicial review.

[¶ 134] Now that we have found this capital construction statutory and regulatory scheme constitutional, we believe that a new approach for fixing or replacing immediate need facilities is now available to school districts that should swiftly resolve SFC delays. The state has shown that adequate funds were appropriated for these facilities and the challengers have shown that the funds were not spent. On a case-by-case basis, a school district can seek review of any decision denying funding if it concludes it cannot build facilities necessary to deliver the educational programs required by law. The SFC may want to preempt more court battles throughout the state and provide for its own expedited process for immediate need facilities.

[¶ 135] The challengers correctly state that an agency may not decide the constitutionality of a statute. *Riedel v. Anderson (In re Conflicting Lease Application),* 972 P.2d 586, 587 (Wyo.1999). However, we agree with the district court that administrative review is appropriate when the issue is limited to whether the agency action such as denying an exception request or rejecting a reasonable bid for construction is denying a school district the facility required by law. The agency may decide this issue without impermissibly judging the constitutionality of

a statute. The school district is then entitled to judicial review.

### CONCLUSION

[¶ 136] We hold the state has demonstrated compliance with the mandates of *Campbell II* as described in detail herein. Certain action has been identified in the area of capital construction which needs to be taken to fairly and constitutionally implement the system chosen by the state to fund construction of school facilities. Additionally, we have addressed problems with application of the WCLI that must be corrected.

[¶ 137] One issue remains. We retained jurisdiction over this litigation, as set forth in *Campbell II* and *III*, because *all parties requested us to do so and* there was substantial action that needed to be taken and much disagreement among the parties about how to correct the deficiencies identified in those opinions. At this point, the challengers seek continued jurisdiction and the state argues strongly that it has complied and this litigation should end. It is interesting to note that this issue is not arising in school finance for the first time. Over thirty-six years ago, in *Hinkle,* 491 P.2d 1234, this Court held portions of the school finance statutes in place at that time unconstitutional and retained jurisdiction for a final decision after the next legislative session. In 1972, the Court relinquished jurisdiction to allow the parties to settle their differences or until some future taxpayer pursued the "invidious discrimination" of that system. *Washakie,* 606 P.2d at 319–20. The legislature did take action, but failed to achieve equality in funding. The problems were not solved by the many legislatures convening between that time and 1980 when the *Washakie* opinion was issued. That opinion gave the legislature two years, or until 1982, to solve the problems of inequality, and directed the district court to retain jurisdiction until legislative action was taken consistent with the opinion. *Id.* at 336. Again, the problems were not solved and *Campbell I* issued in 1995. Yet again, the court held the school funding statutes unconstitutional and the same course was taken, remand to the district court with the instruction to retain jurisdiction. Each time juris-

diction was retained, legislative action was finally forthcoming. In this case, as stated in *Campbell III*, ¶ 28, 32 P.3d at 331, we retained jurisdiction reluctantly and *at the request of both parties*, and went to great lengths to provide flexibility to the parties in hopes of a final resolution.

[¶ 138] Over the long course of Wyoming's school finance litigation, the parties and the courts have steadfastly and in good faith worked toward the challenging constitutional goal of funding primary and secondary public education to assure each child the opportunity to receive a quality education regardless of where that child resides or the location of the school which that child attends so that every child may enter a structurally safe building, which is staffed with competent and sufficient teachers and which contains appropriate and sufficient teaching material and equipment, and upon graduation from high school be "equipped for a role as a citizen, participant in the political system and competitor both intellectually and economically." *Campbell I*, 907 P.2d at 1278. As our opinion today reveals, that challenging constitutional goal has been reached and only a few adjustments to the statutory system remain to be made. Because this Court is confident of the legislature's good faith and genuine commitment to address the adjustments which remain, we conclude there is no reason to retain, and therefore we herewith release, continuing jurisdiction of the matter before us.

[¶ 139] One matter remains that deserves attention. A review of the record of the district court trials in *Campbell I, Campbell II*, and the present action reveals that the same district court judge served as the trial judge in all three trials. It is hard to imagine the hours and days that this public servant has devoted to the school children of this state. For the most part, this Court has agreed with his careful rulings and has been consistently impressed with his mastery of massive volumes of evidence, his understanding of the issues, and his patience with parties passionately devoted to their positions. All involved in this process and in public education owe him a great debt.

[¶ 140] Affirmed in part and reversed in part.